503 F.2d 157
 164 U.S.App.D.C. 66, 1974-2 Trade Cases 75,140
 AMERICAN MAIL LINE LTD. and American President Lines, Ltd.,
Petitioners,
v.
FEDERAL MARITIME COMMISSION and United States of America,
Respondent, R. J. Reynolds Tobacco Co. et al.,
Intervenors.
AMERICAN EXPORT LINES, INC., Petitioner,
v.
FEDERAL MARITIME COMMISSION and United States of America,
Respondents, R. J. Reynolds Tobacco Co. et al.,
Intervenors.
WALTER KIDDE & COMPANY, INC., Petitioner,
v.
FEDERAL MARITIME COMMISSION and United States of America,
Respondents, R. J. Reynolds Tobacco Company et
al., Intervenors.
UNITED STATES of America, Petitioner,
v.
FEDERAL MARITIME COMMISSION, Respondent, R. J. Reynolds
Tobacco Company et al., Intervenors.
INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL-CIO, et al., Petitioners,
v.
UNITED STATES of America and Federal Maritime Commission,
Respondents, R. J. Reynolds Tobacco Company et
al., Intervenors.
 Nos. 73-1252, 73-1334, 73-1395, 73-1400, 73-1401.
 United States Court of Appeals, District of Columbia Circuit.
 Argued Feb. 25, 1974.
Decided June 28, 1974.
 
 Warner W. Gardner, Washington, D.C., for petitioners in No. 73-1252.
 James R. Withrow, Jr., and Sanford M. Litvack, New York City of the bar of the Court of Appeals of New York pro hac vice by special leave of court with whom Andrew J. Kilcarr, Edward Schmeltzer, Robert A. Peavy, Washington, D.C., and Kenneth E. Newman, New York City, were on the brief for petitioner in No. 73-1395 and intervenors Walter Kidde & Co., Inc., and U.S. Lines, Inc.
 Irwin A. Seibel, Atty., Dept. of Justice, with whom George Edelstein, Washington, D.C., was on the brief, for petitioners in No. 73-1400 and respondent, United States of America.
 Edward G. Gruis, Deputy Gen. Counsel, Federal Maritime Commission, with whom James L. Pimper, Gen. Counsel and William H. Smith, Atty., Federal Maritime Commission, were on the brief, for respondent, Federal Maritime Commission.
 Edward M. Shea, with whom John Mason, William F. Ragan, Paul J. McElligott and Gary R. Edwards, Washington, D.C., were on the brief for intervenors R. J. Reynolds Tobacco Co., RJI Corp. and Sea-Land Service, Inc.
 Richard W. Kurrus, Washington D.C., was on the brief for petitioner in No. 73-1334.
 Louis Waldman and Seymour M. Waldman, New York City, were on the brief for petitioners in No. 73-1401.
 Ronald Rosenberg, Washington, D.C., and Howard Schulman entered appearances for intervenor Seafarers International Union of North America.
 Abraham E. Freedman, New York City, entered an appearance for intervenor National Maritime Union of America.
 Before McGOWAN and MacKINNON, Circuit Judges, and CHRISTENSEN,* United States Senior District Judge for the District of Utah.
 MacKINNON, Circuit Judge:
 
 
 1
 Petitioners challenge the authority of the Federal Maritime Commission (the Commission) to approve Agreement No. 9827-1 under which the world's two largest containership operators-- Sea-Land Service, Inc. and United States Lines, Inc.-- would become subsidiaries of the same corporate parent-- ,R. J. Reynolds Tobacco Company. The Commission approved the acquisition agreement on condition that the subsidiaries remain independent companies in competition with each other, except as the Commission same corporate parent-- R. J. Reynolds
 
 
 2
 The dispositive issue is whether the Commission has jurisdiction to approve such an agreement under section 15 of the Shipping Act of 1916, 39 Stat. 733, as amended, 46 U.S.C. 814,[2] which requires all persons subject to the Act to file with the Commission[3] every agreement within specified categories reached with any other person subject to the Act. The statute empowers the Commission to disapprove, cancel or modify any agreement which it finds to be unjustly discriminatory, detrimental to the commerce of the United States, contrary to the public interest, or violative of the terms of the Act, and directs the Commission to approve all other agreements.
 
 
 3
 Of primary importance in the present case is the express provision in section 15 that agreements approved by the Commission are exempt from the antitrust laws. If the agreement in this case is within the Commission's jurisdiction, then the acquisition is effectively shielded from antitrust attack. See FMC v. Seatrain Lines, Inc., 411 U.S. 726, 728-729 & n. 3, 93 S.Ct. 1773, 36 L.Ed.2d 620 (1973); Transamerican Trailer Transport, Inc. v. FMC, U.S.App.D.C., 492 F.2d 617, 624 (1974). We conclude that the acquisition agreement in this case is not the type of agreement encompassed by section 15 and that the Commission therefore lacked jurisdiction to approve the transaction.
 
 
 4
 * United States Lines, Inc. (USL) and Sea-Land Service, Inc (Sea-Land) are the two largest containership operators in the world.[4] USL, the second largest containership operator, is wholly owned by Walter Kidde & Company, Inc. (Kidde), a conglomerate. USL owns 16 modern containerships and 14 modern breakbulk ships, maintains the largest containership operation between Atlantic ports and Western Europe, and also provides through-service between Europe, the Atlantic coast, the Pacific coast, Hawaii and the Far East. Despite this extensive operation, there is some evidence that the company has experienced liquidity problems in recent years.
 
 
 5
 Sea-Land, the largest containership operator in the world, is wholly owned by McClean Industries, Inc., which is wholly owned by R. J. Reynolds Tobacco Company (Reynolds), which in trun is a subsidiary of R. J. Reynolds, Inc., a conglomerate. At the time of the Commission hearing Sea-Land either owned or chartered 61 containerships and had 10 modern containerships under construction. Sea-Land services the Atlantic coast, Northern Europe, the Mediterranean, the Pacific coast, the Far East, Alaska and the Caribbean. USL is its only direct competitor in total United States foreign commerce. However, many of Sea-Land's ships are converted World War II vessels and Sea-Land needs more modern containerships.
 
 
 6
 In 1969 Sea-Land and USL agreed to a 20-year charter of USL's entire containership fleet to Sea-Land, with an option to purchase at the end of the charter period. Related equipment would be similarly leased and certain terminal facilities would be transferred from USL to Sea-Land. The parent corporations guaranteed the obligations of their subsidiaries.
 
 
 7
 In November 1970 the transaction was restructured into a merger-charter agreement. This agreement provided that RJI Corporation, a corporation wholly owned by Reynolds, would merge with USL and that RJI would cease its corporate existence, leaving USL as a wholly owned subsidiary of Reynolds. In return for delivering all outstanding stock of USL to Reynolds, Kidde would receive a promissory note for $65 million. A Supplemental Agreement provided that if the transaction were disapproved by a federal agency, Reynolds would find a substitute purchaser. After the merger, USL would lease its containerships to Sea-Land as in the 1969 agreement.
 
 
 8
 In December 1970 the Department of Justice filed an action in the United States District Court for the District of New Jersey seeking to enjoin this transaction on the ground that it violated the antitrust laws. United States v. R. J. Reynolds Tobacco Co., 325 F.Supp. 656 (D.N.J.1971). The FMC intervened, seeking a stay or dismissal of the court's action pending completion of the FMC's consideration of the transaction, but on April 7, 1971 the court declined to stay the action, concluding that the FMC lacked jurisdiction over the merger embodied in the November 1970 agreement.
 
 
 9
 In March 1972, during final oral argument before the Commission on the November 1970 agreement, the attorney for Reynolds proposed a modified plan which the Commission eventually approved. Under this plan USL would merge with RJI Corporation as in the November 1970 plan, but USL would continue to operate independently of Sea-Land in all respects. The Commission reopened the proceeding and received comments on this new proposal.
 
 
 10
 On February 12, 1973 the Commission approved Reynolds' acquisition of USL upon the condition that USL and Sea-Land operate as independent carriers in all respects in competition with each other, except as the Commission might otherwise approve. The Commission expressed concern over USL's financial condition, found that the public interest would be served by maintaining USL as a viable domestic shipper, and concluded that acquisition by Reynolds offered the best opportunity to restore USL's financial strength. With a nod toward the anticompetitive effects of the acquisition, the Commission imposed certain restrictions designed to insure that Reynolds would operate USL and Sea-Land as separate carriers in competition with each other. These restrictions are set forth in the Appendix to this opinion and are further discussed in part III of this opinion.
 
 
 11
 Petitioners challenge the Commission's jurisdiction under section 15 to approve an acquisition of this type. They also contend that the Commission's procedure in approving the plan suggested at oral argument was insufficient and that neither the evidence nor the Commission's reasoning supports its decision. We find the jurisdiction issue dispositive.
 
 II
 
 12
 The first decision to consider the Commission's section 15 jurisdiction over mergers or acquisitions was Matson Navigation Co. v. FMC, 405 F.2d 796 (9th Cir. 1968), which upheld the Commission's jurisdiction to approve a merger between American Mail Line, Ltd., American President Lines, Ltd. and Pacific Far East Lines, Inc. Under the terms of the merger American Mail Line would remain either a subsidiary of the new corporation or a separate division for steamship operations. The Matson decision asserted reliance primarily on the earlier Supreme Court decision in Volkswagenwerk Aktiengesellschaft v. FMC, 390 U.S. 261, 88 S.Ct. 929, 19 L.Ed.2d (1968), in which the Supreme Court refused to adopt an 'extremely narrow view of a statute (section 15) that uses expansive language.' Id. at 273, 88 S.Ct. at 936. Noting that Volkswagenwerk gave section 15 'the broadest of readings,' the Matson court concluded that a broad interpretation of the statute would include merger agreements. The Matson decision not only was the first decision to uphold section 15 jurisdiction over mergers, it was also the last.
 
 
 13
 The first of several decisions to reject section 15 jurisdiction over mergers or acquisitions was United States v. R. J. Reynolds Tobacco Co., 325 F.Supp. 656 (D.N.J.1971), discussed in section I of this opinion. That case involved the November 1970 merger-charter which preceded the agreement at issue here. After a thorough study of section 15 and its legislative history, Judge Garth concluded that mergers or acquisitions are conceptually different from the types of agreements which Congress intended section 15 to regulate and disapproved Commission jurisdiction over the proposed merger-charter.
 
 
 14
 In Seatrain Lines, Inc. v. FMC, 148 U.S.App.D.C. 424, 460 F.2d 932 (1972), aff'd, 411 U.S. 726, 93 S.Ct. 1773, 36 L.Ed.2d 620 (1973), we held that the statute does not confer jurisdiction over transactions where one shipping company acquires all the assets of another. After carefully examining section 15 and its legislative history, we concluded, as did the court in Reynolds, that the statute was designed to regulate types of agreements which were fundamentally distinct from mergers and acquisitions. Both the Reynolds and Seatrain decisions found the Matson court's reliance on Volkswagenwerk misplaced. Unlike a merger or acquisition, the agreement in Volkswagenwerk was a cooperative working arrangement similar to the agreements discussed in section 15's legislative history,[5] and the Volkswagenwerk decision therefore did not suggest that section 15 jurisdiction includes mergers or acquisitions. See also FMC v. Seatrain Lines, Inc., 411 U.S. 726, 731, 93 S.Ct. 1773, 36 L.Ed.2d 620 (1973).
 
 
 15
 The Supreme Court granted certiorari in our Seatrain case to resolve the conflict between Matson and the Reynolds and Seatrain decisions. Affirming the interpretation of the Reynolds and Seatrain decisions, the Court stated:
 
 
 16
 We conclude that in enacting 15, Congress did not intend to invest the Commission with the power to shield from antitrust liability merger or acquisition of assets agreements which impose no ongoing responsibilities. Rather Congress intended to invest the Commission with jurisdiction over only those agreements, or those portions of agreements, which created ongoing rights and responsibilities and which, therefore, necessitated continuous Commission supervision.
 
 
 17
 Most of the legislative history of the Shipping Act is contained in the Alexander Report which culminated a comprehensive investigation into the shipping industry by the House Committee on the Merchant Marine and Fisheries chaired by Congressman Alexander.[6] It is unnecessary at this point to review the legislative history in detail because a thorough analysis appears in Reynolds and the two Seatrain decisions. It suffices to say that while Congress recognized that shipping conferences had some anticompetitive effects, Congress feared that their abolition would further decrease competition by forcing outright acquisitions or mergers among the shipping companies.[7] Congress therefore decided to allow cooperative arrangements to continue but to subject such arrangements to government supervision and regulation.[8] Thus it was primarily to avoid the greater evil of outright mergers and acquisitions that Congress permitted cooperative working arrangements to exist at all.
 
 
 18
 The legislative history of section 15 evidences a sharp recognition of the differences between cooperative working arrangements which are subject to the Act and mergers and acquisitions which are not. As Judge Garth stated in the Reynolds decision:
 
 
 19
 The catalog or 'full classification of these agreements' (i.e., the 'agreements' to which the Alexander Committee's attention was primarily directed and to which its recommendations were exclusively directed) does not include a single agreement of merger or other form of corporate reorganization. The 'agreements' represented in the Report are all 'ongoing' in nature. Most of these 'agreements' are cooperative working arrangements. These 'agreements' describe practices or regular activities in which two or more shipping companies have agreed to participate over a considerable period of time. None of the 'agreements' studied by the Alexander Committee bears the slightest resemblance to an agreement of merger, which is essentially a single, discrete event, which transforms the relationship of the merging parties at the instant of merger.
 
 
 20
 325 F.Supp. at 658-659. Indeed the Alexander Report expressly distinguished acquisitions from the cooperative arrangements to which the Committee's recommendations were directed.
 
 
 21
 The numerous methods of controlling competition between water carriers in the domestic trade referred to in the preceding pages, may be grouped under three headings viz, (1) control through the acquisition of water lines or the ownership of accessories to the lines; (2) control through agreements or understandings; and (3) control through special practices.
 
 
 22
 Alexander Report at 409. This distinction between cooperative working arrangements and acquisitions by merger or other cooperative reorganizations lies at the heart of the Reynolds and two Seatrain decisions.
 
 
 23
 The Reynolds and Seatrain decisions use the words 'ongoing' and 'continuing' as one basis for distinguishing agreements subject to section 15 from those that are not. For example, summarizing its discussion of section 15 jurisdiction, the Supreme Court characterized section 15 agreements as those which 'created ongoing rights and responsibilities and which, therefore, necessitated continuous Commission supervision.' 411 U.S. at 729, 93 S.Ct. at 1777. And the Reynolds decision noted that 'the 'agreements' represented in the (Alexander) Report are all 'on-going' in nature.' 325 F.Supp. at 659. Mergers and acquisitions, on the other hand, were described as 'one-time agreements creating no continuing obligations,' 411 U.S. at 734, 93 S.Ct. at 1779, and as 'essentially a single, discrete event,' 325 F.Supp. at 659.
 
 
 24
 However, it does not follow from these decisions that a transaction necessarily is subject to section 15 merely because it embodies or is coupled with some ongoing or continuing aspects. The transactions in the Reynolds and Seatrain decisions were single discreet events-- a merger and a sale of assets, respectively.[9] The terms 'ongoing' and 'continuing' were all that were necessary to distinguish the transactions in those cases from cooperative working arrangements subject to section 15. But the courts' language does not require that every agreement which includes some ongoing characteristic is subject to section 15. Whereas all agreements subject to section 15 must be ongoing and continuing in nature, not every ongoing and continuing agreement, or agreement with such consequences, is necessarily subject to the statute. Otherwise, an outright merger or sale of assets could be structured to include some ongoing aspect for the sole purpose of obtaining antitrust shelter under section 15.[10] For example, a merger or sale of assets agreement could provide that the transaction would occur in installments over a period of years. This arrangement would be ongoing and continuing, but it would not necessarily be a section 15 agreement.
 
 
 25
 When confronted with a transaction that is arguably subject to section 15, the court must determine whether the agreement is a cooperative working arrangement which Congress intended to regulate by section 15 or whether the agreement involves, in substance, an outright merger or acquisition beyond the scope of section 15. The agreements expressly enumerated in section 15 illustrate the types of continuing understandings which that section was intended to include. Section 15 specifies agreements--
 
 
 26
 (1) fixing or regulating transportation rates or fares;
 
 
 27
 (2) giving or receiving special rates, accommodations, or other special privileges or advantages;
 
 
 28
 (3) controlling, regulating, preventing, or destroying competition;
 
 
 29
 (4) pooling or apportioning earnings, losses, or traffic;
 
 
 30
 ( 5) allotting ports or restricting or otherwise regulating the number and character of sailings between ports;
 
 
 31
 ( 6) limiting or regulating in any way the volume or character of freight or passenger traffic to be carried;
 
 
 32
 (7) or in any manner providing for an exclusive, preferential, or cooperative working arrangement.[11]
 
 
 33
 The Reynolds and Seatrain decisions emphasize one important characteristic of section 15 agreements: the agreement must impose ongoing obligations which require continuous Commission supervision. But this is not the sole characteristic which distinguishes section 15 agreements from other transactions. Another important distinguishing feature of section 15 agreements is that they do not affect ownership of the parties to the agreement but 'envision the continued existence of the parties.' Seatrain Lines, Inc. v. FMC, supra, at 531, 460 F.2d at 939. In other words, section 15 does not apply to mergers, consolidations and acquisitions, either separately or in conjunction with other agreements. While the parties to a cooperative working arrangement may surrender control over a particular matter for the duration of that agreement, their separate identity and original independence continues in all other respects. Instead of creating conglomerates, cooperative working arrangements leave the parties separate and free to compete in areas not regulated by the cooperative agreement.[12]
 
 
 34
 A merger or acquisition, on the other hand, 'transforms the relationship of the merging parties,' United States v. R. J. Reynolds Tobacco Co., supra, 325 F.Supp. at 659, and 'effectively destroys one of the parties to the agreement.' FMC v. Seatrain Lines, Inc., supra, 411 U.S. at 732, 93 S.Ct. at 1778. Throughout the Alexander Report, 'control through agreements' is carefully distinguished from 'control through acquisition of water lines or the ownership of accessories to the lines.' E.g., Alexander Report at 301, 409. Indeed the Committee feared that elimination of cooperative working arrangements would 'necessarily' lead to 'rate wars' or to consolidation 'through common ownership.' Id. at 416.[13] A natural result of such a change in corporate ownership would be a permanent alteration of the competitive structure of the industry.[14]
 
 
 35
 A third distinguishing characteristic of section 15 agreements is suggested by the statutory language. The statute requires 'every common carrier by water, or other person subject to this chapter' to file with the Commission 'every agreement with another such carrier or other person subject to this chapter.' Thus section 15 agreements must be agreements between parties subject to the Act. A unilateral undertaking by a single party does not constitute a section 15 agreement.[15]
 
 III
 
 36
 Having identified some of the characteristics of section 15 agreements, we must determine whether the acquisition at issue is in substance a transaction which Congress intended the Commission to regulate under section 15. The transaction originated in 1969 as a 20-year Charter Agreement by Sea-Land of USL's containership fleet, with an option to purchase at the end of the charter period. This agreement was later amended to a merger-charter agreement in which Reynolds attempted to acquire USL under the terms of the November 1970 merger agreement so as to insure USL's viability throughout the charter period. While approval of this mergercharter agreement was pending before the Commission, Reynolds suggested that it would drop the charter portion of the agreement and operate USL and Sea-Land independently. It is clear from this suggestion that the parent, Reynolds, possessed and was prepared to exercise extensive power to control USL and Sea-Land if the Commission approved the agreement as so amended.
 
 
 37
 Finally, the Commission did approve Reynolds' acquisition of USL upon certain stated conditions which it designed to insure competition between an independent USL and Sea-Land. See Appendix. Primarily, the conditions require that USL and Sea-Land exist as separate corporate entities and continue to compete, except as otherwise authorized by the Commission. These conditions, argues the Commission, remove the transaction from the realm of ordinary mergers and transform the acquisition into a cooperative working arrangement under section 15.
 
 
 38
 However, we find that the merger is a substantial and principal feature of the transaction. Regardless of what label may be attached to the remainder of the so-called agreement (or undertaking), and regardless of the Commission's possible jurisdiction over that remainder, the merger portion of the agreement is not within the Commission's jurisdiction under the present provisions of section 15. Whether it is desirable for Congress to vest such jurisdiction in the Commission is not for us to determine.[16] Our task is at an end once we conclude that Congress has not conferred merger jurisdiction on the Commission and that the transaction at issue is in substance a merger.
 
 
 39
 It is significant here that after the acquisition a single corporation will own and control both USL and Sea-Land, whereas prior to the acquisition ownership of these companies was separate. Before the acquisition two independent intercorporate structures existed-- USL under the ultimate control of Kidde and Sea-Land under the ultimate control of Reynolds. No ties existed between these two corporate families and they necessarily competed with each other. In fact, the Commission found that USL was Sea-Land's only direct competitor in total United States foreign commerce. Jt. App. at 94. After the acquisition only one intercorporate structure would remain. Sea-Land and USL would be subsidiary corporations under the ultimate control of a single company, Reynolds. As the Alexander Report indicates, 'consolidations . . . through stock control of subsidiaries' was one of the evils which Congress sought to avoid by regulating cooperative agreements.[17]
 
 
 40
 The conditions proposed by the Commission would do little to counteract the effect of USL and Sea-Land belonging to the same corporate family. The Commission seems to suggest that Reynolds' agreement not to sell, dispose of or encumber USL's stock or assets without Commission approval means that Reynolds would not enjoy all the attributes of complete ownership of USL. See Appendix, Condition I. However, the proposed conditions themselves suggest that Reynolds would possess virtually unlimited ownership and control over USL. For example, under Condition II Reynolds assumes all of USL's present expenses, debts and financing, and agrees to provide future financing without taking a security interest in USL's existing assets or future revenues. See Appendix. Additionally, under Condition VII, it is Reynolds rather than USL that is responsible for registering new vessels in the United States when they are delivered to USL.[18] It is unlikely that Reynolds would undertake such responsibilities if it did not consider itself possessed of essentially complete ownership of USL.[19]
 
 
 41
 The Commission contends that the agreement is a cooperative working arrangement because the proposed conditions impose substantial ongoing responsibilities requiring continuous Commission supervision. We are unable to accept this view of the transaction. Condition III provides:
 
 
 42
 USL is to be operated as an independent carrier in all respects in competition with Sea-Land. Upon the adoption by USL and/or Sea-Land of any alteration in their competitive relationship, the FMC on its own motion or on petition of a party or person having an interest, may institute a proceeding to determine whether such alteration is consistent with the terms and conditions herein.
 
 
 43
 Following this general statement the agreement lists six specific conditions (A through F) which purport to insure competition between USL and Sea-Land. See Appendix. The Commission emphasizes this 'agreement to compete' as a prime illustration of the ongoing nature of the transaction, but it ignores the change of ownership which results in a single corporation controlling both carriers.
 
 
 44
 In our Seatrain decision we indicated that an acquisition of assets coupled with an agreement not to compete might be within the Commission's section 15 jurisdiction.[20] Our dictum in that decision suggests only that when two existing carriers agree not to compete, they should file their agreement with the Commission. We did not decide that under such circumstances the Commission would have jurisdiction to approve or disapprove an accompanying merger or acquisition of assets. In fact, our Seatrain decision made very clear that we agreed with Judge Garth's Reynolds decision and disagreed with the Ninth Circuit's Matson decision, in holding that a simple sale of all ships and assets is not within the Commission's jurisdiction.[21]
 
 
 45
 Regardless of the Commission's jurisdiction over agreements not to compete, it does not follow that section 15 confers jurisdiction over the undertaking to compete in this case. An agreement not to compete is precisely the type of arrangement which Congress intended to regulate by section 15. It is an agreement among carriers, which are otherwise in competition, to work together to lessen competition.
 
 
 46
 The undertaking to compete in this case is fundamentally different because the Shipping Act and the antitrust laws already require competition between the carriers. The conditions proposed by the Commission to augment the instant merger would prohibit USL and Sea-Land from establishing a cooperative working arrangement 'except as otherwise authorized by the FMC.' We perceive no difference between these conditions and the general requirement of section 15 that all carriers submit cooperative working arrangements for Commission approval. Section 15 would apply to USL and Sea-Land as separate corporate entities, even if they were commonly owned. Thus the 'agreement to compete,' which the Commission characterizes as imposing ongoing responsibilities, in reality imposes no additional obligations on USL and Sea-Land that are not already imposed by section 15 and the antitrust laws.[22]
 
 
 47
 Condition III.A. prohibits USL and Sea-Land from sharing an interlocking directorate. Like the agreement to compete, this condition constitutes a voluntary agreement not to engage in cooperative, noncompetitive activity. Condition III.A.1. requires one director of each company to be a 'public member' who will report to the FMC.[23] This condition amounts to a unilateral undertaking by USL and Sea-Land individually and separately with the Commission, and is not a cooperative working arrangement which would confer section 15 jurisdiction over the entire agreement.
 
 
 48
 Condition I regulates the manner in which Reynolds will handle USL's stock and assets. Not once is Sea-Land mentioned in Condition I. If we were to assume arguendo that Reynolds, in this instance, could be considered an entity subject to the Act,[24] this condition might be construed as an agreement between Reynolds and USL. But in essence this condition is no more than a unilateral undertaking by Reynolds. No similarity exists between the restrictions on Reynolds' possible sale of USL stock and the cooperative working arrangements contemplated by section 15. Although these restrictions might be appropriate conditions ancillary to a section 15 agreement, they do not in and of themselves confer section 15 jurisdiction over the acquisition by merger.
 
 
 49
 The Commission nevertheless contends that Condition I brings the agreement within section 15 by imposing ongoing obligations which require continuing Commission supervision. For example, the Commission asserts, Condition I.C. expressly subjects the acquisition to 'review by the Commission at least every 5 years,' and under Condition I.D. Reynolds acknowledges the Commission's power to require divestiture of USL stock. However, since section 15 empowers the Commission to disallow or modify an agreement at any time even though the agreement is initially approved, /25/ the conditions impose no additional obligations but simply restate the Commission's continuous jurisdiction that is already prescribed by the statute. Indeed the Commission itself recognized that Condition I adds no additional obligations to the statutory scheme. In discussing the proposed conditions, the Commission stated:
 
 
 50
 What we are doing is modifying the proposed agreement and approving the acquisition of USL by Reynolds upon certain conditions to permit continued Federal Maritime Commission surveillance over the acquisition reserving to ourselves the authority the Commission has over all agreements approved by us under section 15 of the Shipping Act, 1916.
 
 
 51
 Although our general obligation to exercise continuing Commission surveillance is required by the Shipping Act under section 15, we nevertheless restate that obligation in Condition I.C. . . .
 
 
 52
 Jt. App. at 82, 175. Nothing could be clearer than that the Commission was merely restating its statutory authority.
 
 
 53
 We recognize that the Commission intended Condition I as an attempt to avoid some of the problems inherent in unscrambling a merger once it has been consummated.[26] What Reynolds has done in this case is to volunteer to subject itself to the Commission's power under section 15. However, as a statutory entity, the Commission cannot acquire jurisdiction merely by agreement of the parties before it. Weinberger v. Bentex Pharmaceuticals, Inc., 412 U.S. 645, 652, 93 S.Ct. 2488, 2493, 37 L.Ed.2d 235 (1973) ('Parties . . . cannot confer jurisdiction; only Congress can do so.'); cf., e.g., California v. LaRue, 409 U.S. 109, 112-113 n. 3, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972); People's Bank v. Calhoun, 102 U.S. 256, 260-261, 26 L.Ed. 101 (1880).
 
 
 54
 Under Condition II Reynolds undertakes to finance USL. Condition IV relates to the submission of reports to and inspection by the Commission. Under Condition V the Commission retains jurisdiction to modify the conditions. Condition VI requires that the parties not obstruct the performance of the conditions. Condition VII requires the parties to operate vessels registered in the United States. We have no difficulty concluding that these conditions are not cooperative working arrangements with another carrier or other person subject to the Act, and therefore, that they do not confer jurisdiction under section 15.
 
 
 55
 One final argument by the commission must be considered. The Commission contends that since it had jurisdiction over the 1969 charter agreement originally submitted by USL and Sea-Land[27] and since the Commission is authorized to modify an agreement submitted under section 15, it retains jurisdiction over the acquisition at issue. Notwithstanding the complete elimination of any charter provision in the present agreement and the addition of a corporate reorganization, the Commission apparently views this agreement as simply a modified version of the 1969 charter.
 
 
 56
 The difficulty with this argument is that it would allow the Commission to take jurisdiction over one agreement, transform the agreement into an outright merger and then approve the outright merger. This circuitous procedure would enable the Commission to escape the Supreme Court's holding in Seatrain that the Commission lacks jurisdiction over outright mergers.[28] In our view the Commission's jurisdiction must be measured by the agreement actually approved, not by an agreement which was proposed but discarded.
 
 
 57
 The decision of the Commission approving Agreement No. 9827-1,[29] as modified by the Commission's decision dated February 12, 1973, is accordingly vacated, and the Commission is directed to remove this agreement from its docket.
 
 
 58
 Judgment accordingly.
 
 APPENDIX
 
 59
 (Conditions imposed by the Commission on Reynolds' acquisition of USL.)
 
 
 60
 I. The Stock of USL transferred to RJI is to be held by RJI to insure the independence of USL.
 
 
 61
 A. There shall be no substitution for RJI as the owner of USL stock without FMC approval. Reynolds/RJI shall not sell, pledge or in any way encumber the USL stock.
 
 
 62
 B. The corporate ownership among Reynolds, RJI and USL shall be irrevocable except as may be ordered by the FMC.
 
 
 63
 C. This approval shall be subject to constant surveillance and to review by the Commission at least every 5 years with records and reports remaining confidential.
 
 
 64
 D. Reynolds/RJI acknowledge that the FMC can and may require them to divest themselves of USL stock upon order of the FMC for breach of any condition herein and agree to comply with any such order of divestiture.
 
 
 65
 E. Reynolds/RJI shall not sell or otherwise dispose of, or encumber by lien, mortgage, or otherwise, the assets of USL except upon approval of the FMC.
 
 
 66
 F. No scheme or device may be adopted by USL, RJI, or Reynolds which would result in the distribution or dissipation of the assets or revenues of USL, except that reasonable cash dividends on USL stock may be paid but in no event to exceed net operating profits of USL for the prior corporate fiscal year, based upon sound accounting principles and after adequate provision for debt servicing.
 
 
 67
 II. All expenses, debts and financing of USL operations existing at the time of the consummation of this transaction shall be assumed by Reynolds; and Reynolds in the spirit of presentation made in this proceeding will assist USL in future financing.
 
 
 68
 A. No loans or advances of funds by Reynolds to USL or RJI for the benefit of USL may be secured by the existing assets or future revenues of USL, or by USL voting stock or evidence of voting interest in USL, and USL shall notify the FMC of any inter-company loans and the terms thereof.
 
 
 69
 III. USL is to be operated as an independent carrier in all respects in competition with Sea-Land. Upon the adoption by USL and/or Sea-Land of any alteration in their competitive relationship, the FMC, on its own motion, or on petition of a party or person having an interest, may institute a proceeding to determine whether such alteration is consistent with the terms and conditions herein.
 
 
 70
 A. McLean Industries and Sea-Land shall not have any employees, officers or directors in common with RJI and/or USL, except with respect to 'public members' of the Boards of Directors.
 
 
 71
 1. One director of USL and one director of Sea-Land shall be a 'public member': persons experienced in maritime transportation and corporate finance, who shall be appointed by the Chief Judge of the U.S. Court of Appeals for the District of Columbia or another independent source to be selected by the FMC. These directors shall also be members of the Executive Committees of the Boards of Directors, and shall report to the FMC as to any and all competitive service decisions and as otherwise may be required by the FMC.
 
 
 72
 B. USL and Sea-Land shall establish and maintain separate bids and tariffs for the carriage of military or other United States Government-controlled or generated cargo.
 
 
 73
 C. USL shall be a member in its own name in conferences, pools, and other agreements approved by the FMC or hereafter filed for approval except as otherwise authorized by the FMC.
 
 
 74
 D. USL and Sea-Land may not have common soliciting or general agents, attorneys or accountants, except to the extent authorized by the FMC.
 
 
 75
 E. USL and Sea-Land shall not share in any pool percentages except as authorized by the FMC.
 
 
 76
 F. USL and Sea-Land shall not enter into any ship sale, ship charter, space charter, equipment interchange, transhipment, or any similar type of arrangement, or any type of service rationalization arrangement with each other without FMC approval.
 
 
 77
 IV. USL, RJI, Reynolds, Sea-Land and McLean Industries shall submit to the FMC, in form as prescribed by the FMC, semiannual reports verified by the president and the treasurer or secretary of such corporations with respect to the adherence to all the conditions contained herein.
 
 
 78
 A. The FMC shall have access at all times to all records of USL, RJI, Reynolds, Sea-Land and McLean Industries with respect to the maintenance of these conditions, particularly, but not limited to Condition III.B.
 
 
 79
 V. Any party or any person having an interest in the subject matter may at any time petition the FMC for modification of any of these conditions, and jurisdiction shall be retained by the FMC to amend, modify, or cancel these conditions in part or in whole pursuant to such petition or on the Commission's own motion after notice and hearing when required.
 
 
 80
 VI. As used in these conditions, 'Reynolds,' unless otherwise identified, means R. J. Reynolds Industries, Inc. Sea-Land, Reynolds Tobacco, Reynolds Industries, McLean Industries, RJI and USL mean those companies so identified; provided, that common employees among these companies shall not be prevented except as provided in Condition III.A. No subsidiary, parent, successor, or other organizations or corporations similarly or otherwise affiliated with Sea-Land, Reynolds Tobacco, Reynolds Industries, McLean Industries, RJI and USL shall be used or shall take any action to obstruct, prevent or otherwise impair the requirements of these conditions.
 
 
 81
 VII. Reynolds undertakes to place all eight SL7s under United States documentation as rapidly as the vessels are delivered. With the exception of the eight SL7s, and with the exception of other vessels now owned by Reynolds or Sea-Land already built or converted outside the United States and now documented under the laws of the United States, United States Lines and Sea-Land shall operate only vessels built and/or converted in the United States, documented under the laws of the United States, and manned by American crews, provided that existing operations of foreign-flag vessels may be continued but not beyond a period of two years from date. Further provided, subject to Federal Maritime Commission approval, Sea-Land and United States Lines shall not be precluded from using foreing-flag vessels for feedership or like operations under circumstances where, because of the economics of the situation or the laws of other countries, the use of such foreign-flag vessels is required.
 
 
 82
 C v. Seatrain Lines, Inc., 411 U.S. 726, 729, 93 S.Ct. 1773, 1777, 36 L.Ed.2d 620 (1973).
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. 294(d)
 
 
 [1]
 We have jurisdiction to review the Commission's order under 28 U.S.C. 2342(3), and venue under 28 U.S.C. 2343
 
 
 [2]
 The current statute provides:
 Every common carrier by water, or other person subject to this chapter, shall file immediately with the Commission a true copy, or, if oral, a true and complete memorandum, of every agreement with another such carrier or other person subject to this chapter, or modification or cancellation thereof, to which it may be a party or conform in whole or in part, fixing or regulating transportation rates or fares; giving or receiving special rates, accommodations, or other special privileges or advantages; controlling, regulating, preventing, or destroying competition; pooling or apportioning earnings, losses, or traffic; allotting ports or restricting or otherwise regulating the number and character of sailings between ports; limiting or regulating in any way the volume or character of freight or passenger traffic to be carried; or in any manner providing for an exclusive, preferential, or cooperative working arrangement. The term 'agreement' in this section includes understandings, conferences, and other arrangements.
 The Commission shall by order, after notice and hearing, disapprove, cancel or modify any agreement, or any modification or cancellation thereof, whether or not previously approved by it, that it finds to be unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors, or to operate to the detriment of the commerce of the United States, or to be contrary to the public interest, or to be in violation of this chapter, and shall approve all other agreements, modifications or cancellations. No such agreement shall be approved, nor shall continued approval be permitted for any agreement (1) between carriers not members of the same confererence or conferences of carriers serving different trades that would otherwise be naturally competitive, unless in the case of agreements between carriers, each carrier, or in the case of agreements between conferences, each conference, retains the right of independent action, or (2) in respect to any conference agreement, which fails to provide reasonable and equal terms and conditions for admission and readmission to conference membership of other qualified carriers in the trade, or fails to provide that any member may withdraw from membership upon reasonable notice without penalty for such withdrawal.
 The Commission shall disapprove any such agreement, after notice and hearing, on a finding of inadequate policing of the obligations under it, or of failure or refusal to adopt and maintain reasonable procedures for promptly and fairly hearing and considering shippers' requests and complaints.
 Any agreement and any modification or cancellation of any agreement not approved, or disapproved, by the Commission shall be unlawful, and agreements, modifications, and cancellations shall be lawful only when and as long as approved by the Commission; before approval or after disapproval it shall be unlawful to carry out in whole or in part, directly or indirectly, any such agreement, modification, or cancellation; except that tariff rates, fares, and charges, and classifications, rules, and regulations explanatory thereof (including changes in special rates and charges covered by section 813a of this title which do not involve a change in the spread between such rates and charges and the rates and charges applicaable to noncontract shippers) agreed upon by approved conferences, and changes and amendments thereto, if otherwise in accordance with law, shall be permitted to take effect without prior approval upon compliance with the publication and filing requirements of section 817(b) of this title and with the provisions of any regulations the Commission may adopt.
 Every agreement, modification, or cancellation lawful under this section, or permitted under section 813a of this title shall be excepted from the provisions of sections 1-11 and 15 of Title 15, and amendments and Acts supplementary thereto.
 Whoever violates any provision of this section or of section 813a of this title shall be subject to a civil penalty of not more than $1,000 for each day such violation continues: Provided, however, That the penalty provisions of this section shall not apply to leases, licenses, assignments, or other agreements of similar character for the use of terminal property or facilities which were entered into before the date of enactment of this Act, and, if continued in effect beyond said date, submitted to the Federal Maritime Commission for approval prior to or within ninety days after the enactment of this Act, unless such leases, licenses, assignments, or other agreements for the use of terminal facilities are disapproved, modified, or canceled by the Commission and are continued in operation without regard to the Commission's action thereon. The Commission shall promptly approve, disapprove, cancel, or modify each such agreement in accordance with the provisions of this section.
 46 U.S.C. 814 (Supp. II, 1972).
 
 
 [3]
 The Shipping Act originally conferred jurisdiction on the United States Shipping Board. See 39 Stat. 728, 729, 733. By amendment in 1961, jurisdiction over the function exercised here was transferred to the FMC. See 75 Stat. 840, Sec. 103(a)
 
 
 [4]
 There are two methods of shipping cargo by water. When conventional breakbulk vessels are used, the articles in the cargo are packed separately, shipped by truck and/or rail to the port, unloaded from the truck or rail car, and finally loaded onto the ship and stored separately in the hold. Upon arrival at the port of destination, the process is repeated in reverse
 Carriage by containership, on the other hand, permits door-to-door delivery of large quantities of separate articles packed in large sealed containers. These containers, which are generally of heavy construction in 20, 30 or 40 foot lengths, are usually packed at the shipping point of origin, then loaded onto trucks or rail cars which transport them to containerships which carry them to the port of destination. On arrival the containers are unloaded and the contents are transported, still in their original containers, to the designated destination.
 
 
 [5]
 Volkswagenwerk did not involve a merger or acquisition. That decision involved an agreement among the Pacific coast shipping industry employers to finance a union trust fund and to allocate among themselves a common assessment for the fund. The shipping industry employers included common carriers by water, stevedoring contractors and marine terminal operators. The Supreme Court held that this agreement between the shipping industry employers was a 'cooperative working' arrangement' which 'affected competition' and therefore was subject to 15
 
 
 [6]
 House Committee on the Merchant Marine and Fisheries, Report on Steamship Agreements and Affiliations in the American Foreign and Domestic Trade, H.R.Doc.No.805, 63d Cong., 2d Sess. (1914) (hereinafter Alexander Report); see FMC v. Seatrain Lines, Inc., 411 U.S. 726, 736 (1973); United States v. R. J. Reynolds Tobacco Co., 325 F.Supp. 656, 658 (D.N.J.1971)
 
 
 [7]
 See FMC v. Seatrain Lines, Inc., supra, 411 U.S. at 738-739, 93 S.Ct. at 1782 ('We simply cannot believe that Congress intended to require approval of the very arrangements (merger agreements) which, as the legislative history clearly shows, it wanted to prevent.'); Alexander Report at 301, 416
 
 
 [8]
 See note 2 supra
 
 
 [9]
 Although the Reynolds court was aware of the 1969 charter agreement, the court focused on the merger which was the crux of the November 1970 agreement
 
 
 [10]
 We in no way mean to suggest that the present transaction reflects this purpose
 
 
 [11]
 Further illustrations appear in the Alexander Report, which discusses the following categories of transactions:
 Rate agreements Fixed rate agreements Minimum rate agreements Differential rate agreements Control of rates by the dominant carrier Apportioning traffic by alloting the ports of sailing Restricting the number of sailings Limiting each line's volume of freight Pooling arrangements Agreements between conferences, or groups of lines Making deposits as a guaranty of good faith Deferred rebate systems The use of fighting ships, or collective competition Contracts with shippers Joint conference contracts Contracts by individual members of the conference Contracts based on volume of shipments Agreements with American railroads
 
 
 [12]
 Note, The Shipping Industry Seeks a Safe Haven: Merger Jurisdiction for the FMC?, 5 Law & Pol.Int'l.Bus. 274, 279-80 (1973). D. Marx, International Shipping Cartels 250-51 (1953), described the competive situation in a shipping conference as follows:
 One of the salient characteristics of shipping conferences, and one which has been influential in keeping profits from remaining excessive, has been the fact that conferences are not absolute monopolies. It is important to remember that shipping conferences are not combines linked by shareholdings or any other form of common ownership. It will be recalled that the Imperial Shipping Committee described them as follows: 'A shipping conference is a meeting in which competitors face one another with the object of achieving that minimum of co-operation which will suffice to prevent such chaotic competition as might render impracticable the liner system of working ships. Each member of a conference is seeking the minimum surrender of his competitive freedom which is compatible with this object; his attitude in debate is determined by the sources of strength which lie behind his diplomacy.'
 
 
 [13]
 In addition to the combinations by agreement there are numerous instances of consolidations among steamship lines by actual amalgamation or through stock control of subsidiaries . . .. This movement toward actual consolidation by ownership, various witnesses have emphasized, would have taken place more rapidly and on a much larger scale if the making of steamship agreements and conferences had been impossible. In the absence of cooperation through written or oral agreements, according to these witnesses, only two alternatives present themselves, viz, consolidation by actual ownership or the elimination of the weaker lines through cut-throat competition
 Alexander Report at 301.
 
 
 [14]
 Note, supra note 12, at 280
 
 
 [15]
 It is unnecessary in this case to decide whether a fourth distinguishing characteristic of 15 agreements is that they 'affect competition.' See Volkswagenwerk Aktiengesellschaft v. FMC, 390 U.S. 261, 273, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968). The Volkswagenwerk decision appeared not to eliminate this requirement but only to give it an expansive interpretation
 
 
 [16]
 The U.S. shipping industry . . . claims that if it is to survive it must be exempt from the antitrust standards normally applied in determining the anticompetitive effect of mergers. The industry would prefer a procedure in which the antitrust aspects of mergers are viewed in light of other and perhaps overriding considerations, such as the need to preserve the industry by improving its efficiency by all appropriate means, including mergers. In view of its sensitivity to industry problems and needs, the Federal Maritime Commission . . . is considered by the industry to be best suited to exercise jurisdiction over mergers
 Note, supra note 12, at 274-75.
 
 
 [17]
 Note 13 supra
 
 
 [18]
 Under Conditions III.A. and VI, Reynolds and USL are not precluded from having common officers and directors
 
 
 [19]
 A statement by counsel for the Commission at oral argument highlighted the unity of the proposed Reynolds-USL-Sea-Land corporate family. After counsel pointed out that the proposed conditions required charter arrangements between USL and Sea-Land to receive Commission approval, counsel was asked whether 15 did not already require such approval. Counsel replied:
 Well, sir, there's some question here, without this independent structure, whether or not Reynolds, since they already chartered into the Sea-Land organization, the charter would have become effectuated, it would all be over. We only have one entity.
 Transcript at 46. This statement should be contrasted with the same counsel's statement shortly thereafter:
 You have a merger of the stock interest, yes, that is correct, sir. That interest up on top, we do not deny that. But what we do say, sir, is you do not have a consolidation of two different shipping companies. They are still held as independent corporate entities.
 Transcript at 47. These statements illustrate the transparency of the Commission's argument.
 
 
 [20]
 We recognize that there is a certain apparent inconsistency (more apparent than real) in holding that the parties are not required to file with the Commission and the Commission is not required to approve or disapprove a simple contract for the sale of ships and all assets, and yet a similar contract coupled with an agreement not to compete, which may involve more complicated antitrust issues than the more simple sale contract, is required to be filed and the Commission may have jurisdiction to pass on all questions, including antitrust issues. The explanation lies in (1) the wording of Section 15, (2) its legislative history, (3) the fact that the degree of antitrust complexity is not what determines the Commission's jurisdiction, and (4) perhaps in a caveat. 148 U.S.App.D.C. at 437, 460 F.2d at 945. An agreement not to compete was not present in Seatrain and is not present here
 
 
 [21]
 Id. at 437-438 & n. 42, 460 F.2d at 945-946 & n. 42
 Our Seatrain dictum raises the possibility that the Commission might have jurisdiction over the ongoing portion of an agreement that includes a merger or acquisition. The Supreme Court in their Seatrain decision also suggested that the Commission has jurisdiction over 'only those agreements, or those portions of agreements, which created ongoing rights and responsibilities.' 411 U.S. at 729, 92 S.Ct. at 1777. The Department of Justice suggests that the Commission could exercise jurisdiction over an ancillary agreement not to compete after the courts determine the validity of the underlying acquisition under the antitrust laws. Brief for the United States of America at 46 n. 9. We do not reach this question in the present case. It is interesting to note, however, that in Seatrain the FMC argued to the Supreme Court that 15 jurisdiction over mergers should not hang on such a slender thread as the existence of a covenant not to compete.
 The Court below also suggested that the Commission can be ousted from jurisdiction and the aims and objectives of the Shipping Act frustrated by the simple expedient of omitting 'on-going' or 'continuing' arrangements in drafting agreements of sale or merger in the shipping industry.
 Thus, if instead of an outright purchase of Oceanic's vessels in the case at bar, PFEL had entered into a long term charter (10-15 years), or coupled the acquisition agreement with a covenant not to compete, the agreement, according to the court below, would have been subject to the Commission's Section 15 jurisdiction. Such an 'on-going' arrangement would have little or no different effects under the shipping and antitrust statutes. Therefore, by altering the actual mechanics of an acquisition or merger, the form rather than the substance of the transaction would control the ultimate disposition of any administrative or judidicial preceding. Such a result is both unsound and undesirable.
 Brief for FMC at 44-45, FMC v. Seatrain Lines, Inc., 411 U.S. 726, 93 S.Ct. 1773, 36 L.Ed.2d 620 (1973).
 
 
 [22]
 This discussion assumes that the agreement is between the two carriers, USL and Sea-Land. If the conditions are construed as an agreement between Reynolds and the Commission or between Reynolds and USL, then there might not exist an agreement between two entities subject to 15. In the present case we need not resolve whether Reynolds is subject to 15 by virtue of its involvement with its shipping company subsidiaries
 
 
 [23]
 Condition III.A.1. provides that the public member 'shall be appointed by the Chief Judge of the U.S. Court of Appeals for the District of Columbia or another independent source to be selected by the FMC.' This procedure raises ethical questions which might interfere with this court's future jurisdiction
 
 
 [24]
 See note 22 supra
 
 
 [25]
 Note 2 supra
 
 
 [26]
 See FMC v. Seatrain Lines, Inc., supra, 41 U.S. at 735, 93 S.Ct. 1773, 36 L.Ed.2d 620; Seatrain Lines, Inc. v. FMC, supra, 148 U.S.App.D.C. at 427, 460 F.2d at 935
 
 
 [27]
 It is unnecessary to express our opinion on whether the original charter was within 15 jurisdiction. We note, however, that a charter of all assets for an extended period might be treated for jurisdictional purposes as an acquisition of assets, especially if the charter is coupled with an option to purchase. Cf. United States v. Columbia Pictures Corp., 189 F.Supp. 153, 181-183 (S.D.N.Y.1960)
 
 
 [28]
 Such a procedure could lead to sharp practices by parties desiring antitrust immunity based on FMC approval. We do not imply that any of the parties to the present agreement had this intent
 
 
 [29]
 Since the Commission lacked jurisdiction to approve the acquisition of USL by Reynolds, the Commission likewise lacked jurisdiction over the Supplemental Agreement whereby Reynolds agreed to find a substitute purchaser if the transaction were disapproved by a federal agency. We express no opinion on whether the Commission would have had jurisdiction over the Supplemental Agreement if our decision with respect to the acquisition had been different