**UNITED STATES of America,
Plaintiff,**

v.

**R. J. REYNOLDS TOBACCO COMPANY,
RJI Corporation, Sea-Land Service, Inc.,
Walter Kidde & Company, Inc., and
United States Lines, Inc., Defendants.**

**Civ. A. No. 1668–70.**

United States District Court,
D. New Jersey.

April 7, 1971.

———◆———

Raymond W. Young, U. S. Atty., Chief, Civil Division, Newark, N. J., Donald Flexner, Kenneth A. Sagat, Charles J. Walsh, Dept. of Justice, Antitrust Division, New York City, for plaintiff.

Pitney, Hardin & Kipp, by William D. Hardin, Newark, N. J., Donovan, Leisure, Newton & Irvine, by James R. Withrow, Jr., and Sanford M. Litvack, New York City, for defendants Walter Kidde & Co., Inc. and United States Lines, Inc.

Carpenter, Bennett & Morrissey, by Elmer J. Bennett, Newark, N. J., Davis, Polk & Wardwell, by Lawrence E. Walsh, Thomas P. Griesa, and Ronald V. Bryant, New York City, Ragan & Mason, by William F. Ragan, Washington, D. C., for defendants R. J. Reynolds Tobacco Co., RJI Corp., and Sea-Land Service, Inc.

Edward G. Gruis, Deputy Gen. Counsel, Federal Maritime Commission, Washington, D. C., for intervenor.

## OPINION

GARTH, District Judge:

The basic issue before this Court is the statutory authority of the Federal Maritime Commission (FMC) over mergers in the shipping industry. Does Section 15 of the Shipping Act (46 U.S. C. § 814)[1] grant the FMC authority over merger agreements in providing that "every agreement * * * controlling, regulating, preventing, or destroying competition" shall be filed with the FMC and that such agreements, if approved, shall be immune from the antitrust laws?[2]

The chronology of events which preceded the applications before the Court may be summarized as follows: On October 27, 1969 R. J. Reynolds Tobacco Company and its subsidiary, Sea-Land Service, Inc. entered into an Agreement —Time Charter—and Equipment Lease with Walter Kidde & Company, Inc. and its subsidiary, U. S. Lines, Inc. The October Agreement provided for the lease from U. S. Lines of 16 containerships and supporting equipment to Sea-Land and granted Sea-Land an option to purchase the ships and equipment at the expiration of the term of 20 years. That Agreement was submitted to the FMC for approval pursuant to 46 U.S.C. § 814.

On November 9, 1970 the defendants modified and amended the October Agreement by restructuring the transaction as a merger into U. S. Lines of RJI Corporation, a subsidiary of Reynolds organized for the purpose of implementing the merger. Under the restructured agreement, U. S. Lines will be the surviving corporation as between U. S. Lines and RJI Corporation, and will become a wholly owned subsidiary of Reynolds (and consequently an affiliate of Sea-Land, which is also owned by Reynolds).

A Supplemental Agreement was also entered into on November 9, 1970 by Reynolds and Kidde. It provides for alternative dispositions of the stock and assets of U. S. Lines in the event that the merger cannot be consummated.

Pursuant to the terms of the Merger Agreement, the defendants filed copies thereof with the FMC and the Interstate Commerce Commission (ICC) on November 9, 1970. The FMC has commenced hearings relating to the Merger Agreement, but the ICC has apparently not yet done so. Until the approval of both Commissions is obtained, the merger will not, according to the express terms of the Merger Agreement, be consummated.

The Antitrust Division of the Justice Department filed the instant complaint on December 15, 1970 to enjoin the implementation of the Merger Agreement and to obtain an order invalidating the Supplemental Agreement. The complaint alleges these agreements to be in violation of § 7 of the Clayton Act (15 U.S.C. § 18) and § 1 of the Sherman Act (15 U.S.C. § 1), respectively, due to their present and anticipated anti-competitive effect upon certain international segments of the U.S. shipping industry.

On January 5, 1971 the FMC petitioned for leave to intervene as a party,

1. "Every common carrier by water, or other person subject to this chapter, shall file immediately with the Commission a true copy, or, if oral, a true and complete memorandum, of every agreement with another such carrier or other person subject to this chapter, or modification or cancellation thereof, to which it may be a party or conform in whole or in part, fixing or regulating transporation rates or fares; giving or receiving special rates, accommodations, or other special privileges or advantages; controlling, regulating, preventing, or destroying competition; pooling or apportioning earnings, losses, or traffic; allotting ports or restricting or otherwise regulating the number and character of sailings between ports; limiting or regulating in any way the volume or character of freight or passenger traffic to be carried; or in any manner providing for an exclusive, preferential, or cooperative working arrangement. The term 'agreement' in this section includes understandings, conferences, and other arrangements. * * *"

2. It is uncontested that such immunity attaches to agreements which are approved by the FMC and properly within its competence.

pursuant to Rule 24, F.R.C.P., and applied for a stay or dismissal of the instant proceedings to enable it to complete the FMC proceedings concerning the subject matter herein. The disposition of these FMC applications depends upon the answer to the question initially set forth, to wit: Does Section 15 of the Shipping Act (46 U.S.C. § 814) grant the FMC authority over merger agreements in providing that "every agreement * * controlling, regulating, preventing, or destroying competition" shall be filed with the FMC and that such agreements, if approved, shall be immune from the antitrust laws?

At the outset, the issue of this Court's jurisdiction must be clarified. The Sherman and Clayton Acts invested the several District Courts with jurisdiction to restrain violations of said Acts, 15 U.S.C. §§ 4 & 25. Nothing in the Shipping Act can be construed as a withdrawal of jurisdiction from this Court over antitrust actions concerning shipping agreements which have not yet been approved by the FMC, Carnation Co. v. Pacific Westbound Conference, 383 U.S. 213, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966), or though approved, were outside the statutory competence of the FMC. Hence, the issue before the Court is the appropriateness of "prior resort", i. e., " * * * whether * * * [the Court] should exercise * * * [its] jurisdiction initially or require 'prior resort' to the appropriate [administrative] agency." [3]

The chief argument of the FMC and the defendants is that the ordinary meaning of the statutory language ("every agreement * * * controlling, regulating, preventing, or destroying competition") is broad enough to include the Merger Agreement. The Justice Department vigorously opposes this contention by recourse to legislative history.

This Court is persuaded that Congress did not intend to subject merger agreements to the supervision of the FMC. Therefore, the answer to the question initially posed above is that Section 15 does *not* grant the FMC authority over merger agreements. In so holding, I rely in large part upon the Alexander Report,[4] which was the source of the Congressional policy embodied in the Shipping Act. My interpretation of Congress' intent in this area is based on numerous factors, including the distinctive utilization of the term "agreement" in the Alexander Report.

Section 15 of the Shipping Act is substantially a transcription of the recommendations of the Alexander Report.[5] The essential provisions as well as the unique terminology of the Report are evident in the Act. The agreements referred to in Section 15 are exemplified in the eighty agreements discussed in the foreign trade segment of the Alexander Report.[6]

The catalog or "full classification of these agreements" [7] (i. e., the "agreements" to which the Alexander Committee's attention was primarily directed

3. von Mehren, The Antitrust Laws and Regulated Industries: The Doctrine of Primary Jurisdiction, 67 Harv.L.Rev. 929, 932 (1954). Moreover, when an agreement within the FMC's competence has been approved by the FMC, it would appear that the immunity from antitrust laws takes effect in the form of a substantive affirmative defense to a complaint, rather than through the loss of subject matter jurisdiction by the Court.

4. House Committee on Merchant Marine & Fisheries, Report on Steamship Agreements and Affiliations in the American Foreign and Domestic Trade, H.D.C. No. 805, 63rd Cong., 2d Sess. (1914).

5. See especially Alexander Report at 419–20.

6. "The facts contained in the foregoing report show that it is the almost universal practice for steamship lines * * * to operate * * * under the terms of written agreements, conference arrangements or gentlemen's understandings, which have for their principal purpose the regulation of competition. * * * Eighty such agreements or understandings * * * are described in the foregoing report. (For a full classification of these agreements see pp. 281 to 295 of the report.)" Alexander Report at 415.

7. Id.

and to which its recommendations were exclusively directed) does not include a single agreement of merger or other form of corporate reorganization. The "agreements" represented in the Report are all "on-going" in nature.[8] Most of these "agreements" are cooperative working arrangements. These "agreements" describe practices or regular activities in which two or more shipping companies have agreed to participate over a considerable period of time. None of the "agreements" studied by the Alexander Committee bears the slightest resemblance to an agreement of merger, which is essentially a single, discrete event, which transforms the relationship of the merging parties at the instant of merger.

Consistently throughout the Report, mergers and other corporate reorganizations, when occasionally mentioned, are referred to by the terms "consolidation by ownership"[9] and "control through acquisition"[10], or variations thereof. Never is the word "agreement" used in the Report to refer to a merger agreement. It is clear that the Alexander Committee distinguished conceptually between agreements in the sense of on-going, cooperative agreements and agreements of "consolidation" or "acquisition" (of which merger agreements are a form).

"The numerous methods of controlling competition between water carriers in the domestic trade, referred to in the preceding pages, may be grouped under three headings, viz, (1) control through acquisition of water lines or the ownership of accessories to the lines; (2) control through agreements or understandings; and (3) control through special practices." Alexander Report at 409.

It must be assumed that the Alexander Committee knew that acquisitions of water lines and ownership of accessories to such lines were the products of contracts or agreements, as that term is commonly understood. Hence, the separation by headings (in the quotation above) of "(1) control through acquisition" from "(2) control through agreements", as distinct methods of controlling competition, is meaningless if the term "agreement" is construed as broadly as the FMC urges.

■■■ I, therefore, reach the unavoidable conclusion that "agreement" is a term of art, a word of technical legal significance, as used by the Alexander Committee and Congress in enacting Section 15 of the Shipping Act.

I find support for this view on the face of the statute itself. The statute sets forth in a series, seven types of agreements which must be submitted to the FMC. Five of the categories in the series are specific and unambiguous.[11]

8. The categories discussed by the Report include the following:
Rate agreements
  Fixed rate agreements
  Minimum rate agreements
  Differential rate agreements
  Control of rates by the dominant carrier
Apportioning traffic by allotting the ports of sailing
Restricting the number of sailings
Limiting each line's volume of freight
Pooling arrangements
Agreements between conferences, or groups of lines
Making deposits as a guaranty of good faith
Deferred rebate systems
The use of fighting ships, or collective competition
Contracts with shippers
  Joint conference contracts
Contracts by individual members of the conference
Contracts based on volume of shipments
Agreements with American railroads

9. See, e. g., Alexander Report at 301.

10. See, e. g., id. at 409.

11. The five specific categories of agreements include:
  "fixing or regulating transportation rates or fares,"
  "giving or receiving special rates, accommodations, or other special privileges or advantages,"
  "pooling or apportioning earnings, losses, or traffic,"
  "allotting ports or restricting or otherwise regulating the number and character of sailings between ports"
  and "limiting or regulating in any way

The last category is obviously more generalized ("or in any manner providing for an exclusive, preferential, or cooperative working arrangement"). Each of the five specific, unambiguous categories logically falls within the generalized last "catch-all" category.

Finally there is the clause in dispute here: "controlling, regulating, preventing, or destroying competition", which appears as the third of the seven categories but differs in character from the others. The plaintiff submits that the last "catch-all" clause must be read as limiting the "anti-competitive" clause which precedes it. Sutherland, Statutory Construction § 4908 (3rd ed.). Thus, plaintiff contends, only those anti-competitive agreements which are also "exclusive, preferential, or cooperative working arrangements" are included in the Act. Merger agreements consequently are excluded, in plaintiff's view.

I, however, do not attribute to Congress a deliberate and methodical attempt to except merger agreements. To do so would be to deprecate the draftsmanship of that body. Rather, I believe that Congress' concern was affirmatively to subject a limited type of agreement to the supervision of the FMC—and nothing more. Congress used expansive language in order to include the manifold variations of the on-going working agreements. Congress, in my view, was not dealing with mergers or with other agreements which were not working arrangements.

The purpose of placing restrictive working arrangements under the supervision of the FMC was to police abuses of such agreements [12], yet to encourage the proper employment of such agreements [13]. As plaintiff points out, mergers were not similarly seen as desirable phenomena. On the contrary, mergers, which result in a reduction of competi-

tors in the industry (and not merely a reduction of competition), were anathema to the Committee.[14]

The overriding concern of the Alexander Committee was to forestall structural concentration in the shipping industry. To achieve this end, it gave the FMC the authority to approve and thereby immunize working arrangements from the antitrust laws. Congress thereby sacrificed a measure of competition in order to prevent monopolization.

The conclusion which I draw from these policy considerations was rejected by the FMC in Agreement for Consolidation or Merger Between American Mail Line Ltd., American President Lines Ltd., and Pacific Far East Lines, Inc., initial decision, pp. 12–13 (May 18, 1967). The FMC stated that not all mergers create or tend to create monopolies and cited § 7 of the Clayton Act (15 U.S.C. § 18) in support of that proposition. Hence, the FMC concluded, mergers not tending to create a monopoly may be (and were so viewed by the Alexander Committee) just as desirable as restrictive working arrangements.

I disagree, because there is no suggestion in the Alexander Report that certain mergers, however minor in scope, were seen as antidotes to major restructuring of the shipping industry and monopolization. Moreover, the FMC is not the appropriate forum to distinguish between "bad" mergers (presumably all mergers which violate § 7 of the Clayton Act tend to create the evil which the Alexander Committee feared) and "good" mergers. The FMC gives consideration to the lessening of competition as but one of a number of factors relevant to the standards of "operating to the detriment of the commerce of the United States" and "contrary to the public interest." But only a rigorous determination of market concentration pursuant to judicial guide-

---

the volume or character of freight or passenger traffic to be carried."

12. Alexander Report at 417–18.

13. Id. at 300–01.

14. Id. at 301 & 416.

lines can separate "bad" from "good" mergers. "[T]he full and unconditional force of the antitrust laws",[15] must be applied to mergers.

The defendants assert that the Alexander Report was concerned with mergers and other corporate reorganizations, and consequently that the Act applies to mergers. In addition to the reasons given above, I reject this argument since the Report made no recommendations regarding mergers, while it did make specific recommendations regarding various types of working arrangements.[16]

Defendants rely upon Matson Navigation Company v. FMC, *supra,* which appears to be the only precedent directly on point. The majority in *Matson* held, *inter alia,* that the FMC has jurisdiction to approve merger agreements under Section 15 of the Shipping Act. *Matson* relied heavily upon Volkswagenwerk Aktiengesellschaft v. FMC, 390 U.S. 261, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968), even though *Matson* recognized that *Volkswagenwerk* did not deal with a merger agreement.

> "As to the sort of agreement covered by the section, the [Supreme] Court in *Volkswagenwerk* gave the section the broadest of readings." *Matson, supra,* 405 F.2d at 800.

In *Volkswagenwerk* the agreement before the Supreme Court was clearly a co-operative working arrangement similar generally to the scores of agreements studied by the Alexander Committee.[17] The *Volkswagenwerk* agreement provided for the imposition of an assessment upon cargo by various shipping companies organized in the Pacific Maritime Association. The purpose of the assess-

ment was to finance a fund for the benefit of workers of these companies. Inasmuch as there was no issue raised in *Volkswagenwerk* as to merger authority, it would appear that that decision cannot properly govern the disposition of this issue.

The other arguments advanced in *Matson* assume a Congressional intent favoring FMC authority over mergers. However, it is that intent which is the key issue for determination. Congress intended to dilute antitrust policy with respect to restrictive on-going working agreements or arrangements among shipping companies; but it does not necessarily follow from that fact that Congress also intended that mergers embodying a more serious anti-competitive character were to be similarly treated.

■ It is my view that if Congress had the intention to include agreements of merger within FMC's authority, it would have expressed that intention more precisely.[18] Authority to immunize transactions from the antitrust laws is not granted by Congress or implied by the Courts casually, United States v. Philadelphia Nat. Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), California v. Federal Power Commission, 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962), because "the antitrust laws represent a fundamental national economic policy." Carnation Co. v. Pacific Westbound Conference, *supra,* 383 U.S. at 218, 86 S.Ct. at 784.

Defendants' extensive reference to considerations of the national interest in shipping are irrelevant to the construction of the statute. As plaintiff points out, "[c]onsideration of the policy to be pursued by the FMC where it has jurisdiction sheds little light on the issue of

---

15. Matson Navigation Co. v. FMC, 405 F. 2d 796, 800 (9th Cir. 1968), which held contrary to the view expresed here.

16. Alexander Report at 415–24.

17. See dissenting opinion of Carter, C. J. in *Matson,* 405 F.2d at 803.

18. Express authority to approve mergers is contained in the Interstate Commerce Act, § 5(2), 49 U.S.C. § 5(2), the Federal Aviation Act of 1958, § 408, 49 U.S.C. § 1378 and the Federal Communications Act of 1934, 47 U.S.C. §§ 221, 222.

whether it, in fact, has jurisdiction." (Plaintiff's Reply Brief at 21.) Moreover, the Courts have consistently rejected proofs of supposed social advantages of particular transactions which violate the antitrust laws.[19] Such arguments are no more welcome when the issue is the construction of the scope of a statute immunizing whole categories of agreements.

■ I find little merit in defendants' argument that Congress' silence in 1940, when supervision over domestic shipping was transferred from the FMC to the ICC, indicates an earlier intent to include mergers in the original authorization to the FMC. Derivation of legislative intent from silence is generally questionable. Cleveland v. United States, 329 U.S. 14, 67 S.Ct. 13, 91 L.Ed. 12 (1946).

The defendants also contend that the Interstate Commerce Commission has the power to approve the Merger Agreement and thereby exempt it from the operation of the antitrust laws. The defendants have maintained in briefs and oral argument that the merger falls within the jurisdiction of the ICC. They ask this Court to grant a stay pending ICC review of the Merger Agreement, although the ICC is not a party to these proceedings and the only application for a stay or dismissal of the plaintiff's complaint is that of the FMC.

Jurisdiction of the ICC may be invoked under 49 U.S.C. § 5(2) (a) which provides: "It shall be lawful, with the approval and authorization of the Commission * * * for a person which is not a carrier and which has control of one or more carriers to acquire control of another carrier through ownership of its stock or otherwise * * *."

Antitrust immunity is predicated on 49 U.S.C. § 5(11) which provides: "* * [A]ny carriers or other corporations, and their officers and employees and any other persons, participating in a transaction approved or authorized under the provisions of this section *shall be and they are relieved from the operation of the antitrust laws * * * insofar as may be necessary to enable them to carry into effect the transaction so approved or provided for* in accordance with the terms and conditions, if any, imposed by the Commission, and to hold, maintain, and operate any properties and exercise any control or franchises acquired through such transaction." (emphasis supplied).

The predominant portion of shipping activity conducted by Sea-Land and U. S. Lines is devoted to transportation of freight in foreign commerce. Only a minimal percentage of the total business of these two carriers is derived from intercoastal trade. The intercoastal competition between these two carriers represents a relatively small percentage of total competition affected by the proposed merger. For example, an affidavit submitted by Dr. John J. McMullen, former president of the defendant U. S. Lines, estimated that only about 5% of U. S. Lines' total revenues are presently derived from intercoastal service.

The defendants maintain that were the ICC to approve this Merger Agreement, the entire merger would be immunized from antitrust scrutiny. In support of this position the defendants rely on McAllister Brothers, Inc., 317 I.C.C. 459 (1962); Canadian National Transportation Ltd., 93 M.C.C. 80 (1963); Wilson

---

19. " * * * [P]ractices harmless in themselves, or even those conferring benefits upon the community, cannot be tolerated when they tend to create a monopoly; those which restrict competition are unlawful no matter how beneficent they may be." United States v. Manufacturers Hanover Trust Co., 240 F.Supp. 867, 943 (S.D.N.Y.1965). See also Brown

Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), Standard Oil Co. of California et al. v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949), United States v. Aluminum Co. of America, 148 F.2d 416 (2d Cir. 1945), United States v. Bethlehem Steel Corp., 168 F.Supp. 576 (S.D.N.Y.1958).

Storage & Transfer Co., 36 M.C.C. 221 (1940); Yellow Transit Freight Lines, Inc., 70 M.C.C. 471 (1957); and Bruce Motor Freight, Inc., 39 M.C.C. 489 (1943).

These cases are authority only for the position that the ICC must review a transaction or merger in its entirety rather than in segmented portions. These authorities do not raise the issue of the scope of the antitrust exemption provided by § 5(11).

The defendants also rely on Ladue Local Lines, Inc. v. Bi-State Development Agency, 303 F.Supp. 560, 561 (E.D.Mo. 1969), where the court reiterated the well-established principle that "the Commission's approval of an application under 49 U.S.C. § 5 relieves the acquiring carrier from the operation of the antitrust laws." In *Ladue*, the Interstate Commerce Commission approved an application submitted by an agency engaged in both interstate and intrastate commerce. While the technicalities of intrastate bus transportation would be amenable to the informed judgment of the Commission, the nature and complexities of marine transportation of freight in foreign commerce would clearly be beyond the scope of ICC expertise.

Under these circumstances it would be inappropriate for me to rule on matters affecting ICC jurisdiction with respect to the Merger Agreement. Suffice it to say that in a situation such as that presented here, where only a minimal connection of defendants' operations with interstate commerce is shown, total exemption or immunity from the antitrust laws is not appropriate.

An appropriate order shall be submitted granting FMC permissive intervention under Rule 24(b), F.R.C.P., denying a stay of the instant proceeding and denying FMC's motion to dismiss the complaint.