UNITED STATES of America, Plaintiff,

v.

R. J. REYNOLDS TOBACCO CO. et al., Defendants.

Civ. No. 1668–70.

United States District Court, D. New Jersey.

June 22, 1976.

Bernard Wehrmann, New York City, by Donald Ferguson and Thomas A. Bernstein, New York City, for United States Dept. of Justice, Antitrust Div.

Carpenter, Bennett & Morrissey, Newark, N. J. by Elmer J. Bennett, Newark, N. J., for R. J. Reynolds Tobacco Co., RJI Corp. and Sea-Land Service, Inc.

Guy Miller Struve, James W. B. Benkard and Hiram D. Gordon, Davis Polk & Wardwell, New York City, for Carpenter, Bennett & Morrissey.

Pitney, Hardin & Kipp, Newark, N. J. by Clyde A. Szuch, Newark, N. J., for Walter Kidde & Co., Inc., and United States Lines, Inc.

Sanford M. Litvack, Kenneth E. Newman, New York City, John J. McGrath, Jr., Washington, D. C., and Steven M. Hayes, New York City, Donovan, Leisure, Newton & Irvine, Washington, D. C., for Pitney, Hardin & Kipp.

## OPINION

BIUNNO, District Judge.

This is a civil action by the United States which mainly calls upon the Court to exercise its authorization to enter a declaratory judgment as to the rights and legal relations of the parties in respect to two contracts claimed to violate the antitrust laws. See 28 U.S.C. Sec. 2201. Aside from the declaratory remedy, the United States also seeks the equitable remedies of injunction and rescission. See 28 U.S.C. Sec. 2202.

The particular contracts involved are two: a contract for the acquisition by merger of U. S. Lines (the Merger Agreement); and a contract guaranteeing the seller the merger purchase price, plus interest, after sale of U. S. Lines to someone else if the Merger Agreement be frustrated (the Supplemental Agreement).

A brief review of the history is essential at the start in order to provide context for an understanding of the contracts and of the issues in dispute.

At some time in the past, United States Lines, Inc. (U. S. Lines), was a separate company operating both passenger and cargo vessels in ocean and coastal trade. In the international competition between England, France, Italy, Germany and the United States (with vessels like the Mauretania, the Bremen, the Normandie, the Queen Mary, the Andrea Doria and others), it was the flagship of this company, the United

States, which attained the highest speed (35.59 knots) in 1952 on a crossing from New York to Bishop's Rock. See "Lincoln Library of Essential Information," Frontier Press, Columbus, Ohio, 34th Ed., 1971, at p. 1212. The coming of the international air services a short time later soon tolled the knell for most ocean passenger service, and U. S. Lines became a cargo carrier. At some time in the 1960's it was acquired by Walter Kidde & Company (Kidde) during its conglomerate formation years.

Sea-Land Service, Inc. (Sea-Land) was a cargo carrier that was a subsidiary of McLean Industries, Inc., a trucking company, which pioneered the concept of handling cargo in containers suitable for transport on trucks or by rail as well as by ship. This concept was an evolution of an earlier one, conceived by Seatrain, of putting whole railroad cars on ships. At some time in the 1960's, as part of its diversification program, R. J. Reynolds Tobacco Company (Reynolds) acquired McLean and its subsidiary, Sea-Land.

In 1969, Kidde management was disenchanted with the U. S. Lines acquisition. U. S. Lines had converted some traditional cargo ships into container ships, but had heavy commitments to construct more. It had leases for piers on the North River (New York) with rentals of millions of dollars a year but which were not suited to handle container ships. Kidde's first approach was to negotiate a charter agreement for the ships to Sea-Land. Under the charter, U. S. Lines would provide the ships, crews, maintenance and repair, and was to receive a fixed payment by the year for 20 years, thus establishing what was essentially a fixed, long-term investment structure.

The charter agreement was filed for approval with the Federal Maritime Commission (FMC), under 46 U.S.C. Sec. 814 (Sec. 15 of the Shipping Act of 1916). But, before final action and consummation, the fast decaying economic conditions led Kidde to the conclusion that only a complete disposition of U. S. Lines would meet the parent's corporate needs.

It will be remembered that late 1969 saw the first strong rise in interest rates in decades, and that the spring of 1970 saw the "credit crunch" and liquidity crisis, marked by the collapse of Penn-Central, the collapse of Rolls-Royce, the near collapse of Lockheed, and the brink of financial disaster for many otherwise long-established and successful enterprises. This history is not long behind us, but it is too easily submerged as an unpleasant experience not to be remembered.

In any event, Kidde sought through traditional channels to find a buyer for U. S. Lines, but without result. There was a proposal from the president of U. S. Lines, who had owned a substantial interest before the Kidde acquisition, but it was largely to be paid out of future earnings, without providing the cash infusion that Kidde management felt it needed.

At this point, Sea-Land and Reynolds learned of Kidde's desire to sell. Sea-Land itself was in a potentially precarious operating position because, as a pioneer in container shipping, it had gained a head start by assembling a fleet of World War II tankers which it had converted to carry containers. These ships were approaching the twilight of their useful life, and the availability of newer ships from U. S. Lines offered an opportunity to solve that problem readily.

From the negotiations and legal drafting that followed, the Merger Agreement and the Supplemental Agreement were developed. They were signed on November 9, 1970, and the Department of Justice, Antitrust Division, was promptly informed of them, as was FMC.

A reading of the Merger Agreement shows conclusively that it was drawn in reliance upon the existing law as then on the books. Although the Shipping Act had been in existence for some 54 years, the only judicial ruling on the point was *Matson Navigation Co. v. FMC*, 405 F.2d 796 (CA–9, 1968). There were also similar rulings by FMC, such as *Agreement No. 8555, between Isbrandtsen S.S. Co., Inc.*, and *American Export Lines, Inc.*, 7 FMC 125 (1962). That

sole judicial ruling, as well as the FMC rulings, concluded that agreements for the merger of common carriers subject to the FMC chapter of Title 46 came within Sec. 15 of the Shipping Act of 1916 (46 U.S.C. Sec. 814) and upon their filing and approval by that agency, were immune from the antitrust laws.

The Merger Agreement was drawn in this context, that is, as an executory contract not to take effect or be consummated unless and until it had been approved by FMC, as well as by the Interstate Commerce Commission (ICC) which has jurisdiction for coastwise (interstate) traffic, and the Federal Maritime Administration (FMA), which has a voice in some aspects; but these agencies other than FMC had no function in respect to antitrust immunity; that function under the law as then known belonged to FMC alone.

The charter agreement covered the 16 container ships (and supporting equipment) owned by U. S. Lines, but not the 14 conventional (breakbulk) ships already on charter to the Military Sealift Command.

The Merger Agreement, on the other hand, necessarily covered all of the U. S. Lines ships and all its assets. It called for a merger of U. S. Lines with RJI Corporation, a wholly-owned subsidiary of Reynolds which was formed solely for the merger, and which was otherwise inactive. The purchase price for U. S. Lines (net of assets and liabilities) was $65 million, with interest at 8% per annum, and at 6% per annum on the accrued but unpaid 8% interest. These two rates result in a combined accrual of interest at the rate of some $5.5 million a year, or nearly $460,000 per month.

The Merger Agreement provided a period of 5 years to consummate the closing; if the approvals required were not obtained or if consummation were precluded by order of a court of competent jurisdiction, the Merger Agreement died on November 9, 1975, and the Supplemental Agreement was activated by its own terms.

The basic provisions of the Supplemental Agreement were that if the merger were frustrated U. S. Lines was to be sold to a third-party buyer. Kidde was assured of receiving the agreed price plus interest, regardless of the price realized on the third-party sale. If that price were less than the Reynolds price plus interest, Reynolds was obligated to make up the difference. If it were more, the excess went to Reynolds.

Since U. S. Lines is not a fungible commodity with a ready market and ascertainable market price, contractual machinery was set up to accomplish the objects of the Supplemental Agreement. The first step was for Reynolds to designate an independent financial institution to handle the search for a buyer. This was to be done within 30 days, or not later than December 9, 1975. If the effort to find a buyer were not successful by November 9, 1976, then the institution was to arrange for disposition by one or more of several methods: (1) a public stock offering of the U. S. Lines stock; (2) a distribution of U. S. Lines stock pro rata to Reynolds shareholders; (3) a sale of U. S. Lines assets as on a liquidation, with the sale proceeds being first applied to its liabilities and the balance being the net price realized for the purpose of the Reynolds guarantee.

If a buyer were found during the one-year period Reynolds was to have no standing to object except for one or the other (or both) of two reasons: (1) if the buyer's financial credit was such that Kidde required Reynolds to guarantee satisfaction of the payments (this could only arise if the purchase terms involved installment payments); and (2) if the sale price were below the fair value of U. S. Lines.

If such a buyer were not found, then the selection of one of the three alternate methods of sale, or a combination of them, was left to the financial institution, subject to the qualification that the selection was not to be one that would be "materially disadvantageous" to Reynolds.

The procedural history is worth recording. As noted above, the *Matson* case, *supra,* had ruled that a merger agreement came within FMC jurisdiction under 46 U.S.C. Sec. 814 and if approved was immune from the antitrust laws. Although

no review by the Supreme Court was sought or obtained, the United States did not acquiesce in that decision. When informed of the making of the Merger and Supplemental Agreements, it filed its suit here on December 15, 1970.

■ This, of course, it had the right to do since it is only the Supreme Court of the United States that can speak with authority to assure uniformity of federal law among the several circuits and districts.[1] Since the issue of jurisdiction of FMC over mergers had not been dealt with by that Court, and since there was no decision on the subject in the Third Circuit, the United States was free to argue a position contrary to the ruling in *Matson, supra.* And, at the trial level, Judge Garth was free to follow or reject that ruling.

Contrary to *Matson,* Judge Garth ruled that FMC jurisdiction under the statute did not extend to a one-time merger or acquisition without "on-going" operations for FMC to regulate, and that this court possessed jurisdiction to rule on the antitrust challenges to both the Merger and Supplemental Agreements. *United States v. R. J. Reynolds, etc.,* 325 F.Supp. 656 (D.N.J.1971), cert. den., 410 U.S. 974, 93 S.Ct. 1434, 35 L.Ed.2d 706 (1973).

The issue was presented on a motion by FMC for dismissal of the complaint, or for stay of the action pending completion of the FMC hearing then in progress. The conflict about jurisdiction, then, arose directly between FMC, an agency of the United States, and the Antitrust Division of the Department of Justice, another agency of the United States. Both the motion to dismiss and the motion to stay were denied by Judge Garth, as shown by his reported opinion, which dealt with the Merger Agreement and mentioned the Supplemental Agreement only in his recital of the factual history.

A petition for the extraordinary writ of certiorari, to review Judge Garth's decision of April 7, 1971, was filed in the Supreme Court, but was not acted on until March 5, 1973, when it was denied. *R. J. Reynolds Tobacco Co. v. United States* (October Term 1971), 410 U.S. 964, 93 S.Ct. 1434, 35 L.Ed.2d 706 (1973).

Judge Garth, meanwhile, had entered an order on April 21, 1971. Section I embodied his ruling on the matter of jurisdiction. Section II dealt with the scope of the order, extending it to officers, directors, employees and agents. Section III was a preliminary injunction against consummating or implementing the Merger Agreement or the Supplemental Agreement pending final hearing. Section IV allowed the United States leave to make further applications for relief. Section V reserved the right to defendants to move at any time to vacate or modify the order.

The preliminary injunction in Section III allowed the parties to prepare certain documents and furnish them to an accounting firm, as long as they were not disclosed to Reynolds or its subsidiaries. It also provided that it should not impair discovery rights in any court or agency, and nothing in the injunction barred the further processing of the FMC application.

It is important to note that the ruling and the order went only to the issue of

---

1. It is a matter of some amusement to note that this widely recognized principle is one for which it is difficult to find explicit precedent above the district court level. Yet, it must be hornbook law because the existence of a conflict between the decisions of the courts of appeal in two or more circuits provides a major basis for the grant of certiorari by the Supreme Court. See for example, *Bruning v. U. S.,* 376 U.S. 358, at pp. 359–360, 84 S.Ct. 906, 11 L.Ed.2d 772 (1964).

That the district courts are bound by the decisions of the Court of Appeals of their own circuit is evidenced by *Massaro v. United States Lines Co.,* 198 F.Supp. 845 (DC–Pa., 1961), aff'd, 307 F.2d 299 (CA–3, 1962). The Court of Appeals adhered to its earlier decision, by which the district court ruled it was bound, but made no mention of the principle (as it need not have since it was free to change its mind).

*John Deere Co. v. Graham,* 333 F.2d 529 (CA–8, 1964), seems to be one of the few rulings at that level which states the principle and which was affirmed by the Supreme Court, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), but, again, without mention of the principle.

jurisdiction, and that the injunction *pendente lite* was solely designed to preserve the *status quo*. The merits of the dispute, i. e., whether either or both agreements contravened the antitrust laws, were neither addressed nor decided.

FMC hearings were conducted and culminated in a report and order of February 12, 1973, which approved the Merger Agreement with some modifications, ruled that the Supplemental Agreement was within its jurisdiction (which the parties to it had challenged) and disapproved it. *Agreements No. 9827 and 9827–1, Merger Agreement—U. S. Lines, Inc.*, 16 F.M.C. 134 (1973). Two of the five Commissioners dissented, 16 FMC at 242–247.

A review was had in the Court of Appeals, District of Columbia, which agreed with Judge Garth's ruling that FMC lacked jurisdiction. *American Mail Line, Ltd. v. FMC*, 164 U.S.App.D.C. 235, 503 F.2d 157 (1974).

Meanwhile, another case had worked its way up the judicial ladder on a closely-related issue involving an acquisition of assets, and on that case the Supreme Court ruled that the FMC lacked jurisdiction to approve agreements to acquire assets with ensuing immunity from the antitrust laws. *Federal Maritime Commission v. Seatrain Lines*, 411 U.S. 726, 93 S.Ct. 1773, 36 L.Ed.2d 620 (1973).

The subsequent effort to have review in *American Mail Line* resulted in a denial of certiorari, 419 U.S. 1070, 95 S.Ct. 656, 42 L.Ed.2d 665 (1974), as well as of the ensuing petition for rehearing, 421 U.S. 1017, 95 S.Ct. 2425, 44 L.Ed.2d 686 (1975). This left standing the direction to FMC to remove the Merger Agreement from its docket, 503 F.2d at p. 171, and the determination that FMC lacked jurisdiction over the Supplemental Agreement in view of its lack of jurisdiction to consider and approve the Merger Agreement, 503 F.2d at p. 171.

Proceedings before the ICC had also gone forward. In early 1974, it decided that the Merger Agreement should be approved (with the modifications made by FMC), but in early 1975, after the reversal in *American Mail Line, supra,* the ICC vacated its approval and held that further hearings were required. *Sea-Land Service, Inc. etc.*, 348 I.C.C. 52 (1975). No further disposition by ICC had been made by November 9, 1975, when the Merger Agreement expired. In this way, the litigation over jurisdiction came to an end, without any ruling on the merits in this court, i. e., on the question whether the merger could be consummated without violation of the antitrust laws, although nearly 5 years had passed.

This need not have been the case. The initial ruling herein April 1971 on the jurisdictional question also denied a stay of this proceeding. Thus, preparation for trial and trial on the meritorious antitrust issue could have gone ahead at the same time as the FMC and ICC proceedings. The fault or blame for this delay must be accepted by the court, rather than placed on any of the parties, at least until December 8, 1975, when the case was activated.

F.R.Civ.P. 40 puts in the court the authority and duty to place civil actions on the trial calendar without request of the parties. F.R.Civ.P. 57 enables the court to order a speedy hearing of an action for declaratory judgment, and to advance it on the calendar.

F.R.Civ.P. 65(a)(2) empowers the court, in an action for injunction, to order trial on the merits to be advanced and consolidated with the hearing on an application for preliminary injunction. This is aside from the authority given to the Attorney General (but not exercised in this case) to certify priority in antitrust cases, 15 U.S.C. Sec. 28. And, see "Priorities For the Handling of Litigation in the United States District Courts," Research Division, The Federal Judicial Center, April, 1976 (FJC No. 76–2).

Thus, the court did none of the things it might have done to avoid delay in deciding the merits. It is no answer or excuse to say that even when fully manned, it was understaffed for its total workload, or that it was beset by vacancies that went unfilled for considerable periods, or that the criminal list, generally entitled to priority over the

civil list, grew considerably in that period and consumed the lion's share of the total trial time available.

The reason for this is that the great bulk of the underlying data and factual material needed for a ruling here was necessarily common to the proceedings before FMC and ICC. The court has great powers to control the preparation, processing and presentation of civil cases. Innovation and imaginative management, along with judicial initiative, are the order of the day, and the command of F.R.Civ.P. 1, that the rules be construed "to secure the just, speedy, and inexpensive determination of every action" is the polestar and the standard.

With the denial of the stay, and with awareness that the FMC and ICC were to go forward, an order should have been entered promptly, directing that all discovery materials in the federal agency proceedings were to be available for use in this cause. This is routinely ordered when two actions between the same parties are filed in different districts, both of which have jurisdiction, in the typical race to the courthouse door. The technique makes a single preparation available for both cases, and permits the case that can be reached first to be tried first.

Beyond that, in a non-jury case such as this, in which there is unlikely to be any significant need to observe witnesses while testifying (to pass on matters of credibility) the federal agency record could serve essentially as the trial record here.

Any serious questions that F.R.Civ.P. 43(a), which requires the testimony of witnesses to be taken orally in open court, along with F.R.Civ.P. 77(b), might bar that technique, could easily have been overcome by the appointment of a special master, with directions to sit with the FMC and ICC at their hearings, and to receive and report the evidence, all pursuant to F.R.Civ.P. 53, or by a perpetuation of testimony under F.R.Civ.P. 27(c). Had this been done, the record here would have been compiled and ready for consideration at about the same time it was ready in FMC and ICC. Knowing of the dual purpose of the hearings, the parties could easily have included proofs pertinent to the issue here. These were required to be part of the record before FMC in any event because in considering the Merger Agreement it was required to take antitrust principles (and the facts pertinent to them) into account. *Volkswagenwerk, etc. v. FMC,* 390 U.S. 261, at pp. 273–274, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968), and *FMC v. Aktiebolaget, etc.,* 390 U.S. 238, at pp. 244–246, 88 S.Ct. 1005, 19 L.Ed.2d 1071 (1968). Any additional materials needed here would have been minor.

The technique of appointing a special master to sit with FMC and ICC for the purpose of receiving and reporting the evidence is hardly an innovation. It was approved and encouraged for a nearly identical situation as far back as 1925, for cases where federal and state agencies have separate jurisdictions to deal with interstate or intrastate commerce. Thus, in *Colorado v. United States,* 271 U.S. 153, at p. 167, 46 S.Ct. 452, at p. 455, 70 L.Ed. 878 (1925), Mr. Justice Brandeis observed that:

"In practice, representatives of state regulatory bodies sit, sometimes, with the representatives of the Commission at hearings on the application for a certificate. Occasionally, the Commission leaves the preliminary inquiry to the state body; and always consideration is given by the Commission to the representatives of the state authorities."

The court there was speaking of cases with divided jurisdiction. Here there was a case of uncertain jurisdiction; it was either in FMC or in this court. For both situations, arrangements for the compilation of a single, common evidential record would have secured "the just, speedy, and inexpensive determination" on the merits which F.R.Civ.P. 1 contemplates.

Justice delayed has always been justice denied, and it still is, regardless of the desire or preference of any party or of all parties. The ultimate obligation to avoid delay in doing justice must rest with the court itself.

With this in mind, the court requested all the parties to brief certain questions in

advance of trial, to enable it to decide whether a ruling on the Merger Agreement had any relation to the issues in dispute on the Supplemental Agreement.

The submissions all came to the same basic conclusion, namely, that a decision (if made) on the validity or invalidity of the Merger Agreement would not control the outcome of the challenge to the Supplemental Agreement.

This is partly because the challenge to the Merger Agreement is grounded on Section 7 of the Clayton Act, 15 U.S.C. Sec. 18, under which it must be made to appear that the effect of the merger, if consummated, will be "substantially" to lessen competition or create a monopoly, in the context of the relevant market and market shares, while the challenge to the Supplemental Agreement is grounded on Section 1 of the Sherman Act, 15 U.S.C. Sec. 1, under which the gravamen is a common law conspiracy without any overt act, so that if the conspiracy is shown to exist, the mere making of the agreement would be sufficient so long as it appeared that one of the purposes of the conspiracy was to achieve an unreasonable restraint of trade or commerce.

While these common postures are correct, so far as they go, it is also evident that the Merger Agreement issues are moot. The time for its consummation has run out without trial and decision of the merits. For this reason, the court will not consume its limited time, or the means and substance of the parties, by resolving a dispute that is no longer a case or controversy. It will neither decide how many angels can dance on the point of a pin, nor will it contemplate its navel.

A tentative view on this aspect was announced on the first day of the trial, but with leave to the parties to compile an evidential record on the issue. This has been done.

On that record, it is evident that the theory of the United States rested on an attempt to define the relevant market and sub-market by the narrowest conceivable boundaries, so that the market shares of U. S. Lines and Sea-Land would be the highest percentages possible. This was done by limiting the alleged market to U. S. flag carriers in liner service with fully containerized ships, on selected trade routes where the operations of the two companies are concentrated.

The effort not only fell far short of the mark, but was overwhelmingly disproved by evidence to the contrary. The complaint was obviously drafted on the basis of information supplied by Mr. McMullen, former President of U. S. Lines, who obviously wished to block the Merger Agreement to advance his own purpose to acquire U. S. Lines. It is evident from his biased and distorted affidavit in the case at an early stage that the United States allowed itself to be used as a vehicle for a "strike suit" to advance his personal interests. He was not called as a witness for the United States at trial.

The court finds, from all the evidence at trial, that the relevant market consists of all cargo which can be containerized, which moves as ocean freight outbound from or inbound to the United States in foreign commerce with Western Europe and the Mediterranean, and with the Pacific and the Far East, in conjunction with seaports on the Atlantic Seaboard, the Gulf Coast, the Pacific Coast and the Great Lakes, whether in liner or non-liner service, and whether in ships of United States or foreign registry.

The major expert witness for the United States admitted, on cross-examination, that carriers like U. S. Lines and Sea-Land, which employ special containerized ships, face competition from carriers that have designed and built other kinds of ships, such as barge carriers, roll on/roll off ships, and others. He admitted that other means of packaging for transport, such as "unitized cargo," in which goods are assembled on a wooden pallet and strapped to it to form a unit that can be handled on non-container ships, compete for business with fully containerized systems by eliminating the need for containers and by being able to serve port facilities that do not need the heavy investment in large cranes, marshalling and

classification yards, and the like, which are needed for a fully containerized system.

As his index for market shares, this witness used a calculated capacity for transport based on a number of variables, such as the deadweight tonnage of the ship, its maximum speed in knots, and an assumption (without underlying proof) that the ship would run at maximum speed for some unproved number of days each year.

Not only is the methodology unreliable, but he conceded that he did not know the actual operating speeds of the ships. The carrier's annual report to FMC and ICC disclosed a significantly lower speed actually used than the maximum he assumed, but he had not seen these official reports.

He admitted that the two companies faced competition from other carriers and other port coasts than were included in his study and analysis.

The list of defects in his testimony is much longer, but it would serve no useful purpose to detail all of them here. It is enough to note that he admitted on cross-examination that the figures explored were wrong; that after revising some calculations and tables for redirect, he admitted on recross-examination that some of his new figures were wrong and that he had not revised or corrected others he had admitted were wrong.[2]

This sort of evidence from an expert witness carries such a large risk of misleading the finder of fact as to require that it be rejected as unreliable and hence not credible. See, for example, "How To Lie With Statistics," by Darrel Huff (W. W. Norton & Co., Inc., 1954); and "The Interdisciplinary Exchange Between Lawyers and Experts," 12 Jurimetrics Journal, p. 76 (ABA, December, 1971).

2. The traditional concepts of a "relevant market" and of "market shares" within it obviously have little significance in the maritime shipping industry. By Congressional and administrative policy under § 15 of the Shipping Act, agreements of all kinds except the one-time merger or acquisition of assets may be entered into with FMC approval. It was evidently the philosophy of the Alexander Report, on which the Supreme Court relied heavily for its ruling in the *Seatrain* case, *supra*, that the then widespread practice of entering into all manner of operating agreements be allowed to continue, rather than be forbidden, but subject to regulation. Consequently, all manner of agreements that would otherwise be *per se* violations of the antitrust laws are exempted from them and sanctioned. These include agreements to fix rates (prices), allocation and division of markets, pooling arrangements, and other cooperative arrangements between competitors at the same market level (horizontal).

This means that the "market" at any time bears no reasonable resemblance to a free, open and competitive market, but rather is one that is severely distorted by this wide array of sanctioned agreements. See the testimony of the court-appointed expert witness, Dr. Jules Backman, Exh. C-2 at pp. 63-66.

This distortion is further aggravated if the market analysis is confined to U. S. flag carriers, as the United States urges. Within this group of carriers, other policies and practices of the United States itself intrude. Thus, carriers who receive an operating differential subsidy are required to serve specified trade routes, and may not compete with unsubsidized carriers on other routes without special permission. Similarly, the charter by Military Sea-Lift Command of the 14 cargo ships of U. S. Lines subtracts whatever cargo they carry from what would otherwise be part of the "relevant market," while the so-called "bidding system" for Department of Defense cargo, in which negotiations follow the bidding, and under which the lowest bidder gets no more than 50% of the cargo, adds to the crazy-quilt pattern. Exh. GX-36 shows that in quite a few cases, most of the cargo was carried by other than the lowest bidder, presumably because it lacked space to handle it. This kind of policy, for which no statutory authority was produced although requested by the court, suggests that a carrier with the most capacity on a given trade route is free to decide to bid high—at or close to its published tariff level—knowing that is competitors (who may decide to bid lower) cannot carry the cargo and that it will wind up transporting a large share of the total although it was high bidder. This strategy implies no antitrust or other improper characteristic. The policies and practices of the Military Sea-Lift Command obviously invite that strategy as a matter of individual decision.

A still further distorting policy is that defense cargo is to be shipped in containers. Since U. S. Lines and Sea-Land have the largest container capacity of the U. S. flag lines, and since those lines are to be preferred, the policy serves to concentrate the business in those two companies. Yet, it is the same United States that charges the defendants with violating antitrust laws.

Similar comments and findings apply to the testimony of other witnesses for the United States. A number of them were furnished with a draft affidavit prepared by counsel, the key part of which was drawn to indicate "agreement" with par. 8 through 16 of the Complaint. The assertion of a witness that he "agrees" with a statement in a pleading is not evidence or proof of the fact. It is no more than a vote, a plebiscite. Beyond that, the "agreement" was drawn as to "facts" in those parts of the Complaint, when it appears that most of the "facts" are opinions, definitions or conclusions.

 Opinions are valueless as evidence without exploration of the underlying facts and rationale showing the path from the facts to the opinion. See Fed.Ev.Rule 702–705. The testimony of these witnesses was not helpful to the finder of fact. Most of the opinions were qualified to start with, and were further degraded by the testimony in court. The court finds that the weight to be accorded them is negligible and insignificant, and so that the evidence is not credible.[3]

From the entire record, including the unchallenged compilation prepared by the in-dependent witness named by the court, Fed. Ev.Rule 706, it appears that had the case been expedited for trial and tried on the merits by the methods described earlier, the judgment would have been that the Merger Agreement did not violate the antitrust laws, and it would have been so adjudged early enough to permit its consummation before it expired on November 9, 1975.

While that issue is technically moot, the probable outcome of it is such as to provide meaning and context to the issues involving the Supplemental Agreement, which are not moot.

In that regard, the court finds that:

 1. There was no motive, purpose, intent or probable effect arising from the Merger Agreement that would have violated Section 7 of the Clayton Act if the time had not run out. The Merger Agreement was lawful because it intended consummation only if it did not violate the antitrust laws. Had the FMC been found to have jurisdiction, its approval would have assured that the Merger Agreement was lawful. Since FMC was found not to have jurisdiction, the agreement would probably have been found lawful without regard to the exemption of the Shipping Act.[4]

---

3. The extensive testimony of officials from the Military Sea-Lift Command, in an effort to determine the number of long-tons carried on various routes, showed that the theory of the United States was more like Procrustes' Bed than like the facts.

A considerable mathematical exercise, studded with unproved assumptions, was performed to convert "measurement tons" (40 cubic feet) into "long tons" (2,240 lbs). As the report of the court-appointed expert shows, the number of long tons, the number of containers and the number of cubic feet of cargo is reported for each outbound and inbound sailing to the Maritime Administration on Form MA–578A. See Exh. C–2, exhibits 1 and 2.

The Military Sea-Lift Command keeps figures in measurement tons only, although the manifests record weight as well as volume, because its payments to carriers are based only on cubic feet of cargo (measurement tons). The exercise involved an effort to derive a conversion factor from measurement tons to long tons, and it was obviously unreliable. The actual number of long-tons could have been obtained instead from the Maritime Administration, which does record the figures. There is no point in climbing through the attic window when the front door is open.

The inability of the United States to gather information in the possession of its various agencies, or to use the support of their technical staffs, was beyond understanding. This deficiency was most evident when the United States informed the court that it was not prepared to proceed with cross-examination of a defense witness whose direct testimony it had received more than 2 weeks before, and when it had "no questions" for cross-examination of other defense witnesses. This was at a point when the case was more than 5 years old.

The United States comes before the court on an equal basis, the same as any other party. The responsibility expressed in F.R.Civ.P. 11, applies to the United States as it does to private parties. As the party that filed the complaint, it had an obligation to have reasonable ground to make the allegations in it. The evidence at trial, with some 5 years to prepare, showed that it did not.

4. This is an expression of the art of decision making, which consists of arriving at sound judgments on the basis of incomplete evidence.

■ 2. The Supplemental Agreement has a single, lawful purpose, namely, to assure Kidde of the benefit of the Reynolds guarantee of the agreed merger price, plus interest, in the event of a frustration of the Merger Agreement for any reason, while protecting Reynolds' exposure on that guarantee against an unreasonably low price on a sale to a third party.

■ The court concludes that the applicable law for the purpose of interpreting the agreement is the law of Delaware, according to its terms. *Three Rivers Motors Co. v. Ford Motor Company,* 522 F.2d 885 (CA–3, 1975). It is the meaning of the agreement, as so interpreted, that is tested against federal law to determine whether it violates the antitrust laws.

■ The Delaware courts have applied the rule, widely recognized in many jurisdictions, that every contract will be regarded as containing an implied covenant requiring each party to act in good faith and with fairness. See, *Blish v. Thompson, etc.,* 30 Del.Ch.R. 538, 64 A.2d 581 (S.Ct.1948); *Raisler etc. Co. v. Automatic etc. Co.,* 36 Del. 57, 171 A. 214 (S.Ct.1933); *Association, etc. v. Catholic, etc.,* 61 N.J. 150, 293 A.2d 382 (1972); *Bak-A-Lum Corp. v. Alcoa, etc.,* 69 N.J. 123, 351 A.2d 349 (1976). The same concept is expressed in the Uniform Commercial Code, Sec. 1–203, which has been widely adopted.

■ It is also a universally recognized principle that if the language of an agreement is susceptible of several interpretations, one of which renders the contract unlawful, and the other renders it lawful, the courts will adopt that which renders the contract lawful. See *Restatement, Contracts,* Sec. 236; 17 *Am.Jur.* "Contracts," Sec. 254 (no precedents *contra* are listed); *Great Northern Ry. Co. v. Delmar Co.,* 283 U.S. 686, 51 S.Ct. 579, 75 L.Ed. 1349 (1931) and cases cited.

The argument of the United States is that the Supplemental Agreement is an unreasonable restraint *per se,* under 15 U.S.C. Sec. 1, on the ground that it is inherently pernicious to and destructive of competition and urges that efforts to justify it should not be heard. Alternatively, it argues that it is unreasonable under the circumstances in that the effect on trade and commerce outweighs the justification. See, *American Motor Inns, Inc., v. Holiday Inns, Inc.,* 521 F.2d 1230 (CA–3, 1975).

But both the history of the transaction and the evidence at trial show beyond challenge that Kidde wanted and wants to dispose of U. S. Lines. No antitrust law obliges Kidde to retain U. S. Lines. It is free to dispose of it or liquidate it, as prudent business judgment may dictate, with or without the Supplemental Agreement.

Nor does the evidence establish that the Supplemental Agreement would have the impact or effect of an unreasonable restraint, *Chicago Board of Trade v. United States,* 248 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918), or although an otherwise reasonable restraint, that it was "designed" to achieve a forbidden restraint, *United States v. Columbia Steel Co.,* 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948); *Poller v. CBS,*

It recognizes that the actual and potential market, whether geographic or service based, is best measured by the existence and potential for competition. Dramatic as the container ship concept may be, looked at by itself, the implication that it is the "be-all and end-all" in marine transportation of cargo is simply not sustainable. The system is highly specialized, requires heavy capital investments at fixed port locations, and so is exposed to the same risks as the dodo.

The record shows that other ocean carriers have considered containerization but have decided to go another route, with barge carriers and roll on/roll off ships, and with unitized cargo, for example. This gives them the capability to compete with full container systems while retaining a high degree of flexibility to handle other cargo and to serve ports not equipped for a full container system and not worth equipping. There is obviously a limit, even though not clearly calculable, to which the development of full container systems can be justified, operationally and financially. The intrusion of foreign flag competition (not subject to our antitrust laws) in this area could be devastating.

In this context, the market shares of the two companies is relatively small, and for this reason it is highly likely that the Merger Agreement would have been sustained against challenge if the issue were not moot.

368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962).[5]

The sole purpose of the Supplemental Agreement, as appears from a reading of it, and as confirmed by a reading of it together with the Merger Agreement, was to provide a means to assure Kidde that it would receive the merger price, plus interest, if the merger itself were frustrated for any reason, and it is designed to achieve that end by what amounts to a guarantee by Reynolds of that price. On a third party sale, Reynolds necessarily takes the risk that today's realizable price will be less than the merger price, and stands to gain if it be more.

Naturally, there may have been many other ways to construct the mechanism for sale, but nothing appears to suggest that any other construction would be significantly different. The arrangement calls for a non-party financial institution to find a buyer; this provision reduces the risk of disputes, had either one of the parties been required to undertake that chore, especially since this kind of sale is ordinarily developed through some financial institution. Nor is the fact that Reynolds made the selection of any moment, as it is the one exposed to risk of loss or gain. No one has offered any evidence to suggest that Dillon Read & Company, Inc., will carry out its functions other than responsibly and in compliance with the provisions of the Supplemental Agreement as interpreted by the court.

The Supplemental Agreement is clear by its structure for disposition of U. S. Lines, as well as by express provisions, that the sale is to be made, if at all feasible, so that U. S. Lines will continue as an operating company; it is only as a last resort, if all other methods prove not feasible, that piecemeal liquidation of the assets is authorized. This pattern provides as much or more assurance that U. S. Lines will continue to operate than a sale by Kidde would without the Supplemental Agreement. Kidde would be under no obligation to make that effort.

No agreement of like nature seems to have been the subject of judicial evaluation in the antitrust context. Neither counsel nor the court have found any.

Beyond that, the arrangement is essentially the same as those commonly made for other kinds of transaction in which a sale is conditioned on one or more government agency approvals (e. g., zoning, license transfers, and the like), and the seller is willing to accept the condition only if assured of the contract price, and with the buyer taking the risk, in exchange, of loss or gain on a third party sale.

Accordingly, the Supplemental Agreement is not illegal *per se*. Also, it is not illegal under the circumstances, and the court so finds.

In arriving at these findings, the court has interpreted the Supplemental Agreement in accordance with the principles stated above:

1. Under the agreement, Kidde or U. S. Lines is the seller to the third party, depending on whether the company as a whole is bought or whether some part of the assets (such as the ships under charter to Military Sealift Command) are sold separately from the rest of the company.

The effect on trade or commerce, even if this last resort means prove unavoidable, is negligible when weighed against the justification. A liquidation would hardly be likely to result in scrapping the ships. Their only probable buyers would be other carriers who could use them in their own operations, thus improving their own ability to compete.

The form and pattern of competition might be altered but nothing suggests that it would be reduced or restrained in any significant way.

---

5. The FMC determination, 16 FMC at 216, that the parties intended the destruction, liquidation or dismemberment of USL as a single common carrier as a possible result of the Supplemental Agreement, and consequently disapproving it, is unfounded. The court's finding here is to the contrary. Kidde has an undoubted right, as noted, to dispose of U. S. Lines, including its liquidation or dismemberment. Its right to do so is restricted by the Supplemental Agreement as a course of last resort, only if other means which would preserve U. S. Lines as an operating carrier are not available.

2. The financial institution is the selling agent for Kidde, just as though there were no agreement, and is obliged to do its best to get the best price it can.

3. Because of the provisions of the agreement, the sale or sales are to be such that U. S. Lines will be able to continue in operation, by keeping together in a single sale to one buyer all of the 16 container ships, the associated containers, equipment and facilities.

4. While Reynolds is entitled to object to a proposed sale on the limited conditions specified in the agreement, Kidde is entitled to challenge such objection on the ground that it is not reasonable, i. e., that it violates the implied covenant of honesty and fair dealing. In the event of such a dispute, the court will resolve it, retaining jurisdiction "at the foot of the decree." The United States may also challenge an objection on antitrust grounds only, for like resolution. The standard for resolving a Kidde challenge will be whether the objection by Reynolds is supported by reliable facts and reasonable business judgment in light of the risk of loss or gain undertaken when the contract was made. The standard for resolving a challenge by the United States will be in accordance with antitrust law.

5. The expressions in Section 4 of the Supplemental Agreement, such as "prices acceptable to Reynolds," or "materially disadvantageous to Reynolds," are interpreted to have the meaning indicated, i. e., based on reliable facts and reasonable business judgment, and not violative of the antitrust laws.

6. Since the disposition contemplated by the agreement is to a substitute buyer or to others (including disposition to Reynolds' shareholders), Reynolds will not be eligible to participate in the competitive bidding for the sale of any assets of U. S. Lines if that method be employed, even though this will deprive it of means to reduce its risk which are ordinarily available to a guarantor. Such bidding is not within the contemplation or intent of the parties.

In arriving at this interpretation, the court is mindful that the issues are complicated by the mootness of the Merger Agreement issue, due to the long delay mentioned above. Without that delay, the Merger Agreement could have been ruled valid or invalid long ago. If valid, it could have been consummated by now. If invalid, the search for a buyer could have begun long ago. The delay, which complicates the matter now, was a denial of justice then (which is bad enough), but it ought not to be the occasion or basis for a further denial of justice. The delay calls for amends, and this obliges the court to provide its machinery so that the lawful contracts of the parties may be carried out.

So much of the complaint as attacks the Merger Agreement will be dismissed as moot. That is not merely because it was at all times executory, but also because the time for its performance has run out. In the event that the Merger Agreement is reactivated by the parties, that can only come about by the making of a new agreement, if only to alter the dates, and the issues would then be reopened.

A declaratory judgment will be granted interpreting the Supplemental Agreement and declaring it lawful as so interpreted. The demands for rescission and injunction will be denied.