Sue Ellen MARDER, et al., Donna J. Guba, et al., Karen Lee Irvin, Louise Lewellen, Shirley Gamble, et al., Nancy Jean Tillery, et al., Jayne Tsuchiyama, Oteria T. Myers, et al., Mary Ann Heininger, Lori Kushner, Deborah Gustafson, et al., Karen M. Buell, et al., Judy Perlov, et al., Robin R. Reeder, Nadine Allen, et al., Susan Eve Roza, et al.,

v.

G.D. SEARLE & CO.

Civ. Nos. Y–82–3506, Y–83–387, Y–83–864, Y–83–1144, Y–83–3370, Y–83–3735, Y–84–286, Y–84–775, Y–84–2248, Y–84–2770, Y–84–3779, Y–84–3958, Y–84–4504, Y–84–4569, Y–84–4599 and Y–84–4691.

United States District Court, D. Maryland.

March 19, 1986.

Gertrude C. Bartel, Baltimore, Md., Roger L. Pardieck, Seymour, Ind., and Patricia Jo Stone, Denver, Colo., for plaintiffs.

Paul F. Strain, Nell B. Strachan, Baltimore, Md., and Robert Tucker, Cleveland, Ohio, for defendant.

## MEMORANDUM

JOSEPH H. YOUNG, District Judge.

Following a trial on the basic issue of causation, and the failure of the jury to agree on a verdict on that issue, defendant moved for judgment. Plaintiffs also moved to delay entry of a final judgment dismissing their fraud claims pending a new trial, or in the alternative, requested that the dismissal of their fraud claims be without prejudice.

This case arises out of the seventeen plaintiffs' use of the Copper 7 (Cu-7) Intra-uterine Device (IUD), manufactured by G.D. Searle Company, Inc. (Searle). Plaintiffs allege three types of injuries: pelvic inflammatory disease (PID), ectopic pregnancy, and perforation of the uterus, and the central issue in the first portion of the trial was whether the Cu-7 can cause these disorders. Additional issues were the adequacy of the manufacturer's warnings, and whether Searle breached an express warranty, fraudulently misrepresented the safety of the Cu-7, or was negligent. In this portion of the trial, there were common legal and factual issues, and the proceedings were consolidated for all plaintiffs.

At the close of plaintiffs' case, Searle moved for a directed verdict. That motion was denied as to all issues except for the fraud claim, for which Searle's motion was granted. Judgment has yet to be formally entered on that ruling. On December 13, 1985, after three weeks of trial, the case was submitted to the jury which failed to agree on a verdict. The Court declared a mistrial, and defendant now moves for judgment in its favor.

### Motion for Judgment

Defendant's motion for judgment in its favor is filed pursuant to Rule 50(b), Fed.R. Civ.P. Searle contends that plaintiffs offered no proof that the Cu–7 caused the types of injuries which plaintiffs allegedly suffered, and insists that epidemiological evidence was required to prove causation of PID.

It is undisputed that it is plaintiff's burden to prove causation, as well as the other basic elements of liability. Plaintiffs insist that they have met their burden of establishing causation by a preponderance of the evidence, by proving that more likely than not the Cu-7 IUD can cause the types of injuries which plaintiffs allegedly suffered. In support of this assertion, they have outlined evidence presented at trial. PID causation evidence was provided primarily by Dr. Haverkamp and Dr. Perlmutter, and was supplemented with testimony from Dr. Fives-Taylor and Dr. Baier describing how the disease could be caused. Plaintiffs also maintain that Dr. Orleans reinterpreted Searles's epidemiological evidence to demonstrate a causal connection and that this epidemiological relationship was supported by testimony of two of defendant's witnesses: Dr. Roy and Dr. Daling. Dr. Haverkamp, plaintiffs' chief causation witness, also presented all of the evidence on causation of ectopic (or tubal) pregnancy, and he presented some of the evidence on causation of perforation of the uterus. Drs. Hatcher and Baier, as well as defendant's witness, Dr. Guzinski, offered additional evidence which plaintiffs rely upon to prove causation of perforation of the uterus.

### Standard for Rule 50(b) Motions

 Although Maryland law applies to the substantive issues, the allocation of trial functions between judge and jury is governed by federal law in a diversity action. *Peacock v. J.C. Penney Co., Inc.*, 764 F.2d 1012, 1013 (4th Cir.1985); *Wratchford v. S.J. Groves & Sons Co.*, 405 F.2d 1061 (4th Cir.1969). Because the jury failed to agree upon a verdict, defendant's motion bears a resemblance to both a motion for a directed verdict and to a judgment notwithstanding the verdict. But there is no need to distinguish between the two because the standard is identical for both motions. *Whalen v. Roanoke County Board of Supervisors, et al.*, 769 F.2d 221, 227 (4th Cir.1985) (concurring opinion); *Hawkins v. Sims*, 137 F.2d 66, 67 (4th Cir.1943). After viewing the evidence in the light most favorable to the nonmoving party, judgment should be entered notwithstanding the

jury's failure to reach a verdict if insufficient evidence was presented to support a verdict for the nonmoving party. *Whalen v. Roanoke*, 769 F.2d at 224; *Gairola v. Commonwealth of Virginia Department of General Services*, 753 F.2d 1281, 1285 (4th Cir.1985); *Ralston Purina Co. v. Edmunds*, 241 F.2d 164, 167 (4th Cir.1957), *cert. denied*, 353 U.S. 974, 77 S.Ct. 1059, 1 L.Ed.2d 1136 (1957). The issue can be removed from the jury if evidence provides a "mere possibility" yet not a "probability" of proof. *Mayberry v. Dees*, 663 F.2d 502, 510 (4th Cir.1981), *cert. denied*, 459 U.S. 830, 103 S.Ct. 69, 74 L.Ed.2d 69 (1982).

The Fourth Circuit has emphasized that special care should be taken when assessing the sufficiency of causation evidence, where causation evidence is wholly circumstantial. It is particularly important to be assured that an inference of causation is based upon at least a reasonable probability of causation, in an effort to remove purely conjectural and speculative questions from the jury. *Lovelace v. Sherwin-Williams*, 681 F.2d 230, 242 (4th Cir. 1982). *Accord, Lohrmann v. Pittsburgh Corning Corp., et al.*, 782 F.2d 1156 (4th Cir.1986).

> This emphasis, where causation is dispositive, upon "probability," "reasonable probability," "substantial probability" rather than mere "possibility" as the proper test simply bespeaks the special danger that in a matter so generally incapable of certain proof jury decision will be on the basis of sheer speculation, ultimately tipped, in view of the impossibility of choosing rationally between mere "possibilities," by impermissible but understandable resort to such factors as sympathy and the like. It is of course precisely to guard against this danger that the burden of producing rationally probative evidence—and the corresponding risk of nonproduction—is placed upon claimants and subjected to the ultimate jury control devices of directed verdict and judgment n.o.v.

*Lovelace v. Sherwin-Williams*, 681 F.2d at 242 (citations omitted). In order to determine the sufficiency of the causation evidence presented in the instant case, an analysis of the evidence proffered through each of plaintiff's witnesses in support of a conclusion that the Cu-7 can cause PID, ectopic pregnancy, and perforation of the uterus, must be undertaken.

### Evidence of Causation

#### (a) Dr. Haverkamp

Plaintiffs' primary witness on the issue of causation of all three types of injuries was Dr. Haverkamp, who was proffered as an expert in obstetrics and gynecology. Dr. Haverkamp offered a theory about PID causation. Based on his observation that the IUD causes increased bleeding, he speculated that such bleeding breaks the protective barrier that normally prevents bacteria from infecting the uterus. He also speculated that with a broken barrier the bacteria would reach the uterus through a "capillary action" of the tail string of the Cu-7. The doctor's major complaint with the increased bleeding, however, seemed to be that it obscured the symptoms of PID, making diagnosis of the disease more difficult.

When asked pointedly whether use of the Cu-7 was causally related to the development of PID, Dr. Haverkamp's answer was carefully guarded and limited; he responded that the Cu-7 is "definitely related" to the development of PID but omitted any mention of causation. Dr. Haverkamp had not personally performed studies on the matter but based his opinion on his clinical experience and literature. At one point, Dr. Haverkamp stated that there is a three to five-fold increased rate of PID in women wearing IUD's, and the basis of his opinion was a study conducted by Dr. Ory which was completed in 1976. On cross-exam, it became clear that approximately 38% of the participants in Dr. Ory's study were wearers of the Dalkon Shield IUD, that the Dalkon Shield is associated with approximately a six-fold increase in PID, and therefore, that the study results were skewed by the dominant presence of the Dalkon Shield. Only one participant in Dr.

Ory's study used a Cu-7 IUD, and that patient did not develop PID. Thus, Dr. Ory's study did not yield reliable evidence on the Cu-7 and could not furnish a reasonable foundation for Dr. Haverkamp's testimony.

Viewing Dr. Haverkamp's testimony in its entirety, the assertions of causation of PID were limited to professed relationships or associations between the IUD and the disease. The foundation for the testimony about that relationship was virtually nonexistent; it was not backed by sound scientific evidence that was related specifically to the Cu-7 or IUD's which were comparable to the Cu-7. The explanation of causation was equally speculative, based upon an untested theory that increased bleeding allows the introduction of bacteria. Had such theories been supported then a question for the jury would remain as to their probative value, but mere theory is too far removed from the type of proof required at trial to support a finding of causation. Theory must at least be consistent with supporting evidence to raise a jury question.

Dr. Haverkamp's testimony on ectopic pregnancy, the only testimony plaintiffs presented, was even more speculative. He testified about an association between IUDs and ectopic pregnancy and estimated that women who use IUDs have a ten to twenty percent increase in the occurrence of ectopic pregnancy. But no scientific basis was offered for this alleged increase. Furthermore, Dr. Haverkamp's theory explaining the association highlighted the speculative nature of his assertion. He explained on cross-examination that ectopic pregnancy is caused by damaged fallopian tubes, which may have been caused in some women by the occurrence of PID, which in turn may have been caused by the use of an IUD. This chain of possibilities does not approach the degree of probability required.

Finally, Dr. Haverkamp testified about perforation of the uterus, indicating that *if* the Cu-7 does perforate, then it will cause an inflammation and require surgical removal. Dr. Haverkamp specifically testified that he does not know if the copper of the IUD causes the Cu-7 to imbed in the uterus. Furthermore, he did not testify that the Cu-7 actually causes perforation, or that perforation is not more likely caused by the improper insertion of the IUD by the inserting physician. Thus Dr. Haverkamp's testimony was insufficient to prove a probability that the Cu-7 causes perforation.

*(b) Dr. Orleans*

Plaintiffs' next witness was Dr. Orleans, offered as an expert in the field of epidemiology. Dr. Orleans' chief role was to explain the methodological problems with Searle's own study of the safety and effectiveness of the Cu-7. That study was presented by Searle to the Food and Drug Administration as part of the procedure for obtaining approval for the Cu-7 as a prescription drug. Dr. Orleans' review of the methodology raised questions about the validity of the study which Searle used to assert that there is no increased risk of PID associated with the use of the Cu-7. Dr. Orleans insisted that the study was not designed to test for incidence of PID, that too many of the study's original participants were "lost to follow-up," and therefore, no conclusions about PID could be drawn. Dr. Orleans did speculate that if a conclusion about the incidence of PID could be drawn from this flawed data, then she would reach a conclusion opposite to Searle's. She would conclude from the data that there is an association between the Cu-7 and PID. Although plaintiffs cite this speculation as proof of causation, it is difficult to understand how a reinterpretation of data which, according to the expert's own testimony, is fatally flawed can be offered as reliable proof of causation.

*(c) Dr. Baier and Dr. Hatcher*

These witnesses were cited by plaintiffs as providing evidence of causation of both perforation of the uterus and of PID. Dr. Baier was qualified as an expert in biomaterials and Dr. Hatcher was qualified as an expert in contraception and family planning. The testimony is analyzed together

to illustrate the scattershot approach of plaintiffs, who simply presented a series of alternative unsubstantiated theories.

Dr. Baier discussed the interaction of copper with body tissues and concluded that copper is not suitable for implantation. His theory on perforation is that the copper sticks to the uterine wall, and as the body moves, the copper gradually wears away the tissue, eventually causing perforation. His opinion was based on studies performed on a variety of body tissues, but he was unaware of any studies performed on uterine tissues. Dr. Baier never testified that the Cu-7—because of the copper content or for any other reasons—causes PID.

Dr. Hatcher also commented on the copper content of the Cu-7. It was his opinion that with a copper content the IUD is more effective, and therefore, "more copper is better." This testimony was unsubstantiated by any scientific support yet undermined Dr. Baier's unsupported conclusions about the dangers of copper.

Dr. Hatcher's main focus was on an entirely distinct perforation problem. He testified that the Cu-7 design was undesirable because the tail string can partially retract into the uterus. Allegedly this happens because the string is originally shaped in a loop and the plastic has a "memory" which returns the string to that shape. Dr. Hatcher noted that this retraction may result in a lost string, although the incidence is no higher with the Cu-7 than with any other IUD. He expressed concern that a retracting string could cause potential complications in the diagnosis of perforation of the uterus and explained that if the Cu-7 perforated the uterus and moved into the adjacent cavity, the tail string would appear shorter, but the treating physician might assume that the string had retracted and be less likely to diagnose the perforation. Dr. Hatcher did not offer evidence on the causation of perforation.

On the subject of PID, most of Dr. Hatcher's criticisms were also confined to the tail string. He testified that during insertion a portion of the string remains outside of the inserter, with an increased likelihood that in the process of insertion bacteria will be transferred into the uterus. Once again, there was no evidence offered proving that the occurrence of PID is more frequent in Cu-7 wearers than in non-wearers, or that having the string outside of the inserter does increase the incidence of PID for persons who use IUDs. In fact, Dr. Hatcher's major concern was not that IUDs caused PID, but that PID is an extremely common and serious problem for sexually active women. Dr. Hatcher suggested that IUDs are the least attractive contraceptive choice for women who intend to have children because other forms of contraception (i.e. barrier methods and the "pill") protect against PID while IUDs offer no such protection. This analysis may provide some insight into the usefulness of an IUD for women who wish to bear children in the future and perhaps even raises some questions about the propriety of Searle's promotion of the Cu-7 for nulliparous women (women who have not borne children),[1] but this inquiry is irrelevant to the instant question of causation. Dr. Hatcher's testimony was not probative on the issue of whether the Cu-7 can or does cause PID.

*(d) Dr. Fives-Taylor*

This expert in the field of microbiology performed experiments on the adhesion of bacteria to the plastic tail string of the Cu-7, as compared to the adhesion of bacteria to the tail string of the Copper-T IUD which is made of a different type of plastic. Dr. Fives-Taylor concluded that bacteria has a greater tendency to adhere to the Cu-7 strings and also suggested that "pits" in the string collect bacteria and protect it from the body's defense system. Although plaintiffs at least made an effort to substantiate Dr. Fives-Taylor's theory of causation by presenting her research, the fact that bacteria adheres to the plastic tail string does not provide proof of a probability of causation. Only excessive speculation will lead a jury from the fact that

1. One of Searle's asserted advantages of the Cu–7, as compared to other IUDs, is that its inserter is very narrow, making it easier to insert into nulliparous women.

bacteria adheres to the Cu-7 plastic tail string to the conclusion that the Cu-7 can cause PID. It does not explain how bacteria, sufficient to cause PID, can pass the cervical barrier and enter the uterus.

*(e) Dr. Perlmutter*

As an expert in obstetrics and gynecology, Dr. Perlmutter testified that all IUDs, including the Cu-7, are associated with an increase in PID. Dr. Perlmutter admitted that she could not offer an opinion specific to the Cu-7 because all of the literature includes a variety of IUDs. She simply concluded that, because no literature demonstrates that the Cu-7 is safer than the other IUDs, she considered the Cu-7 to carry the same risks as the other IUDs. Dr. Perlmutter's opinion was partially based upon observations from her clinical practice, although she had never verified or quantified her observations through documentation of the incidence of PID among Cu-7 users in her practice. Like the other causation witnesses, Dr. Perlmutter did not provide a sufficient scientific or medical basis for her comments on the association of PID and the Cu-7.

Dr. Perlmutter also testified to several unsubstantiated theories of how the IUD acts as a "catalyst" for the development of PID. One such theory was that the IUD causes a depression or erosion of tissues, which in turn causes a "secondary invasion of bacteria." Another theory was that merely by inserting the IUD, enough bacteria is introduced into the uterus to cause PID. Neither of these hypotheses—nor a third which was stricken from the record because Dr. Perlmutter could not say that it was based upon a reasonable degree of medical certainty—appeared to have any scientific basis. Dr. Perlmutter's testimony merely added to plaintiffs' scattershot approach by introducing new theories of causation without providing the trier of fact with any evidence on the basic issue of causation.

*(f) Defendant's witnesses*

Plaintiffs argue that the statements of three of defendant's witnesses were probative of causation. Allegedly, Dr. Guzinski discussed a risk of the IUD perforating the uterus, and plaintiffs suggest that this is evidence of the causation of perforation. A mere mention of the risk of perforation without a discussion of whether perforation is caused by the doctor or the IUD cannot support a jury's finding of causation. Dr. Guzinski did not add causation evidence worthy of consideration to the issue.

Testimony of Dr. Roy and Dr. Daling is cited by plaintiffs as support for finding a greater than two-fold increased risk of PID from the use of the Cu-7. In epidemiological terms, a two-fold increased risk is an important showing for plaintiffs to make because it is the equivalent of the required legal burden of proof—a showing of causation by the preponderance of the evidence or, in other words, a probability of greater than 50%. In epidemiological terms, a figure of 1.0 indicates no change in the risk, and a figure of 2.0 indicates a two-fold risk. Dr. Daling's study revealed a 1.9 risk (with a 95% confidence interval of .9 to 4.0) for women who have used a copper IUD at any time. For women who have used *only* a copper IUD the risk figure is 1.3 (with a 95% confidence interval of .6 to 3.0). This 1.3 figure is most relevant to this case. Neither of these risk figures indicate a two-fold risk, and the 1.3 figure is well below the two-fold risk level.

Plaintiffs would rely upon the upper range of the confidence intervals as evidence of a greater than two-fold risk, but again, this brings plaintiffs out of the range of probability and into mere speculation and possibility. The confidence intervals range from a decreased risk (less than 1.0) to a tripled or quadrupled risk. Yet the likelihood of a 3.0 or 4.0 increased risk is equal to the likelihood of a .6 or .9 decreased risk. The upper range of the confidence intervals signify the outer realm of possibilities, and plaintiffs cannot reasonably rely on these numbers as evidence of the probability of a greater than two-fold risk. Their argument reaches new heights of speculation and has no scientific basis.

Dr. Roy's statements refer to a different type of statistical calculation. Rather than attempting to quantify the increased risk in statistical terms, he was interpreting data on the percentage of women in a given population who develop PID. There was uncontroverted testimony in the trial that in the general United States population, 2–3% of women develop PID. Searle conducted a study on women who used the Cu-7 and concluded that the PID rate was within the normal range. Dr. Orleans, as discussed above, criticized the methodology of the study and then asserted that, if she could rely on the data, she would conclude that the PID rate was closer to 6.7% by including all cases of any type of infection in the number of cases of PID. Dr. Roy disputed Dr. Orleans' assessment and concluded that under her methodology she should have arrived at the percentage of 2.5, which is within the range of PID found in the general population. Plaintiffs seem to confuse the 2.5% figure with the statistical 2.0 increased risk calculation used in Dr. Daling's study; these figures have different meanings and are not directly analogous. Dr. Roy's 2.5% figure does not signify a two-fold increased risk.

*Evaluation of Plaintiffs' Evidence*

Plaintiffs offered a wide variety of experts who presented explanations to the jury about the features of the Cu-7 IUD. In conjunction with these descriptions, the experts described how the Cu-7 can cause a variety of disorders and complications, including those allegedly experienced by plaintiffs. A preliminary issue to the one which seemed to dominate plaintiffs' case about *how* injuries could be caused is the issue which the court defined for litigants at an earlier stage in the proceedings: *can the Cu-7 cause plaintiffs' injuries.* Plaintiffs failed to provide the Court with any sound data to support their experts' guarded statements on causation.

Generally, the experts refused to make unqualified assertions of causation. As noted, plaintiffs offered testimony about an association or relationship between PID and either the Cu-7 or IUDs in general but were unable to state an opinion specifically about the Cu-7, as distinct from all other IUDs. The Court recognizes that evidence or absolute scientific "certainty" may be impossible for either plaintiffs or defendant to obtain in a products liability case of this nature, as it is difficult to isolate one of a variety of factors which *may* have caused an injury. Rosenberg, *Causal Connection in Mass Exposure Cases: A "Public Law" Vision of the Tort System,* 97 Harv.L.Rev. 851, 856 (1984) (proposing proportionality rule for determination of causation). Further, proof of causation must be presented in scientific and medical terms, which may be misinterpreted in a legal setting. For example, reliable evidence of a strong association between a product and an injury may lead a reasonable juror to conclude that a causal relationship is "more probable than not," even though the expert witness never mentioned causation and only testified to an "association." Nevertheless, when presenting evidence of an association, just as with any other expert testimony, there must be some basis beyond mere theory and speculation for the opinion. *See Merit Motors, Inc. v. Chrysler Corp.,* 569 F.2d 666 (D.C.Cir.1977); *State of Washington v. United States,* 214 F.2d 33, 43 (9th Cir.1954), *cert. denied* 348 U.S. 862, 75 S.Ct. 86, 99 L.Ed. 679 (1954) (opinion evidence without any support is not substantial evidence). The opinion of an expert must be based on facts sufficient to form a foundation. *United States v. R.J. Reynolds Tobacco Co.,* 416 F.Supp. 316, 325 (D.N.J.1976); *Logsdon v. Baker,* 366 F.Supp. 332, 336 (D.D.C.1973), *vacated on other grounds,* 517 F.2d 174 (D.C.Cir.1975). *Accord Johnson v. Califano,* 434 F.Supp. 302, 309 (D.Md.1977).

Although evidence could be ruled inadmissible during the course of the trial for lack of a reasonable basis, *Horton v. W.T. Grant Co.,* 537 F.2d 1215 (4th Cir.1976) (relevant expert testimony may be excluded if mere conjecture), this step was rarely taken in the course of these proceedings. When there was a close call as to the admissibility of the evidence which had a weak basis, this Court erred on the side of

admissibility to allow the jury access to the maximum amount of evidence available. *See Wilder Enterprises, Inc. v. Allied Artists Pictures Corporation*, 632 F.2d 1135 (4th Cir.1980). Rule 703, Fed.R.Evid.[2] was intended to broaden the acceptable bases of expert opinion and to enable reliable evidence to be admitted. Admitting such evidence does not preclude the possibility of removing the case from the jury at a later stage if it is determined that in its totality the evidence was insufficient. *See Merit Motors v. Chrysler*, 569 F.2d at 673 (granting summary judgment where admitted evidence was too theoretical).

Defendant seeks a verdict in its favor because plaintiffs failed to present epidemiological evidence demonstrating a probability of causation, urging that such evidence is required in order to state a case sufficient to create a question of fact. It is proper to consider epidemiological studies in this type of tort action, *see e.g. Ellis v. International Playtex, Inc.*, 745 F.2d 292, 301–02 (4th Cir.1984); *In Re Agent Orange Product Liability Litigation*, 603 F.Supp. 239, 246 (E.D.N.Y.1985), but such evidence cannot be flatly required. It is appealing in an area overwhelmed by scientific uncertainty to latch onto a method which appears to dispel that uncertainty. If the use of epidemiological evidence does enhance the integrity of the fact-finding process, it will be helpful to all parties and if possible should be utilized. Like other forms of expert evidence, it is subject to abuse, however, and it should not be viewed as the magical cure for legal disputes. *See In Re Agent Orange*, 603 F.Supp. at 246; *U.S. v. R.J. Reynolds*, 416 F.Supp. at 324. For example, there is a danger that by requiring the presentation of epidemiological evidence, the courts would be handicapping some parties who lack the resources to sponsor studies. In many instances, the epidemiological data may simply be unavailable; this should not

end the inquiry but instead should begin the inquiry into what other types of evidence plaintiff can present to satisfy the burden of proof. *See Ferebee v. Chevron Chemical Co.*, 736 F.2d 1529, 1535–36 (D.C. Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984). There is a range of scientific methods for investigating questions of causation—for example, toxicology and animal studies, clinical research, and epidemiology—which all have distinct advantages and disadvantages. *See, e.g., Ethyl Corporation v. Environmental Protection Agency*, 541 F.2d 1, 26 (D.C.Cir.1976), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976). Rather than focusing on whether plaintiffs have provided a specific type of proof, the inquiry should be whether reliable scientific evidence, which is based upon sound methodology, has been presented, and whether through that evidence plaintiffs arguably have satisfied their burden of proof. The scientific evidence need not prove an absolute certainty of causation but must be sufficient to support a finding of a reasonable probability of causation. *Ferebee v. Chevron*, 736 F.2d at 1536 (in a courtroom, the test for allowing a plaintiff to recover in a tort suit of this type is not scientific certainty but legal sufficiency); *Lovelace v. Sherwin-Williams*, 681 F.2d at 241–42.

Contrary to plaintiffs' assertions, however, this case is unlike *Ferebee*. In *Ferebee*, plaintiff presented expert testimony based upon sound scientific methodology. Finding that the foundation for the expert testimony was acceptable, the *Ferebee* court held that the jury was entitled to believe the testimony, even in the absence of epidemiological evidence. Experts in that case were medical specialists who also were the plaintiff's treating physicians. The expert opinions were based, at least in part, on the patient examination and individual diagnosis. Plaintiffs suggest in their memorandum that they would have

---

2. Rule 703, Fed.R.Evid.: "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him (or her) at or before the hearing. If of a type reasonably relied upon

by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

presented individual treating physicians' testimony during the second stage of the trial and should not be prejudiced by the bifurcation of the proceedings. This is the first time plaintiffs have raised such an argument and they did not attempt to prove causation by questioning an expert as to whether he or she had ever, to a reasonable degree of medical certainty, diagnosed a particular injury as being caused by the Cu-7. Nothing in the form of the proceedings prevented plaintiffs from presenting their best and most convincing evidence on the issue of causation.

*Conclusion*

In essence, this case has dealt with mere possibilities rather than probabilities. It is possible that the women suffered from tissue irritation from the copper, or that too much bacteria was transferred to the uterus at the time of insertion, or that the cervical barrier was broken—either by excessive bleeding or by the string—which allowed bacteria to enter the uterus ... the possibilities may be endless. Yet the probability that any one of these events can occur has yet to be proven in this Court. With this type of theoretical proof, the jury was forced into an exercise in speculation rather than reasoning. In conclusion, plaintiffs failed to present sufficient evidence of causation and a verdict must be entered in favor of defendant. In view of this decision, there will be no need for a new trial, and plaintiffs' motion to delay entry of a final judgment dismissing their fraud claims pending a new trial is denied.